112 So.2d 704

**Mrs. Hattie Larkin MIDDLETON, Mrs. Dorothy Middleton Burguieres, and Fleming Plantations, An Ordinary Partnership Composed of Douglas R. Fleming, Calvin A. Fleming, II, Georgia Fleming Myers and Lou Fleming Reed**

v.

**CALIFORNIA COMPANY et al.**

No. 44480.

June 1, 1959.

Phelps, Dunbar, Marks, Claverie & Sims, Sumter D. Marks, Jr., John G. Weinmann, New Orleans, Louis H. Marrero, III, Marrero, for plaintiffs-appellants.

Milling, Saal, Saunders, Benson & Woodward, Eugene D. Saunders, Chaffe, McCall, Phillips, Burke & Hopkins, Harry McCall, Jr., New Orleans, for appellees.

McCALEB, Justice.

This is a suit to secure partial cancellation of an oil, gas and mineral lease which was granted in January 1937 to C. A. Kelly of Houston, Texas by the predecessors in title of Fleming Plantations, an ordinary partnership composed of Douglas R. Fleming, Calvin A. Fleming, II, Georgia Fleming Myers and Lou Fleming Reed. Kelly subsequently assigned the lease to The California Company, the principal defendant herein. The lease covers some 4,-600 contiguous acres of land, known as Fleming Plantation, located on the left descending bank of Bayou Barataria in the Parish of Jefferson, north of the town of Lafitte. Fleming Plantations, the plaintiff co-partnership, is the owner of the surface and of 98% of the mineral rights of the tract. Mrs. Hattie Larkin Middleton and Mrs. Dorothy Middleton Burguieres, the other co-plaintiffs, own the remaining 2% of the mineral rights.

The defendants are the mineral lessee, The California Company, hereinafter referred to as Calco; certain parties who have derived royalty interests from Calco; others who have acquired royalty interests from Fleming Plantations and the owners of small lots which were part of

Fleming Plantation in 1937, when the lease was executed.

Oil was discovered on the tract during 1939 and, since that time, approximately 17,000,000 barrels have been produced from or allocated to the leased property. From this production plaintiffs have received royalties in excess of $4,000,000 and for the year 1954, the last full year preceding the filing of this suit, the royalties paid to lessors amounted to $248,963.87. This oil has been produced from wells which are situated in an area on the western edge of the property and near its center along a north-south line. Thirty producing wells have been drilled by Calco in this area comprising approximately 400 acres.

Plaintiffs contend that Calco has not reasonably developed the entire acreage and, therefore, the lease should be cancelled as to all parts of the land on which there has been no drilling, excepting a five-acre area surrounding each producing oil well. This claim is founded on several hypotheses but it stems primarily from the circumstance that the production has been obtained from a small area when compared with the entire acreage under lease and that no extensive drilling operations have been conducted on the rest of the property during the 18 years in which the lease has been in existence.

Calco, on the other hand, takes the position that a review of the facts will readily disclose that it has conducted its operations as a reasonably prudent oil producer and has done everything that could be expected of it in developing the leased property.

After hearing the evidence on this issue, the trial judge found for the defendants and dismissed the suit. Wherefore this appeal.

At the outset, we notice that Calco has filed an exception of no right or cause of action which is predicated on the ground that plaintiffs have no standing in court to demand a partial cancellation of the lease because they have not been joined in their demand by some 32 landowners who acquired small lots located within Fleming Plantation, which are subject to the mineral lease. These landowners have been cited by plaintiffs as defendants in the cause. The theory of the exception is that plaintiffs' demand for cancellation of the mineral lease is no greater than the right of each of the persons to whom they have sold portions of the leased property and that, therefore, since the mineral lease is an indivisible contract, plaintiffs cannot maintain this action against the lessee without the concurrence of the other owners.

The trial judge overruled this exception and we have decided to pretermit discussion of it in view of the conclusion we reach on the merits of the case.

The law of this case, like other matters involving cancellation either whol-

ly or partially of a mineral lease, is well settled and hence the issue to be resolved is purely one of fact, that is, whether the mineral lessee has complied with its obligation of full development of the lease with reasonable diligence, it being established that development of every part of the leased property is an implied condition, in this case an express condition, of the contract. See Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26; Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30; Wier v. Grubb, 228 La. 254, 82 So.2d 1 and Sohio Petroleum Co. v. Miller, 237 La. 1015, 112 So.2d 695.

Paragraph 8 of the lease provides in part:

"* * * In the event lessor considers that operations are not at any time being conducted in compliance with this lease, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. * * *"

Pursuant to this provision, the attorneys for plaintiffs notified Calco on May 21, 1955, claiming that it had defaulted on its obligation allegedly because it had failed to drill an oil well during the previous three years and demanding that it commence the drilling of wells on that part of the land on which there had been no development. Since Calco did not comply with this demand within sixty days after receipt of the letter, the question for determination is whether it was in default on its obligation to reasonably develop the property at the time the notice was given.

■ The record shows that, following discovery of oil upon the leased property in 1939 and for over a period of 16 years, Calco produced more than 17,000,000 barrels of oil from the leased property and other land unitized therewith and expended over $7,000,000 in obtaining this production. In addition, it has spent other large amounts to provide facilities for the operation of the leased property and adjacent property producing from the same geological structure. However, since the producing oil wells have been located and drilled on a small area (approximately 400 acres) when compared to the total acreage under lease, it is important to ascertain the steps that have been taken by Calco in an effort to develop the other parts of the property.

It is to be observed at this point that apparently Fleming Plantations, whose managing partner is Douglas R. Fleming, was well satisfied with Calco's development of the lease from 1940 until sometime in 1952 for, although a demand was made for further development in 1943, it was

subsequently withdrawn and, just prior to 1948, Douglas R. Fleming advised Calco that he did not want additional wells drilled during the flush production of the wells already drilled, evidently being contented in view of the large royalties which were being received by plaintiffs aggregating more than a quarter of a million dollars per annum. During 1952, Mr. Fleming began making inquiry as to further development and he testified that, from 1952 until the default letter of May 21, 1955, he endeavored to obtain information concerning the plans and intentions of Calco. Discussions were had with Mr. Morris A. Betts, a representative of that company, who, Fleming says, always answered his queries by stating that the company's information did not justify the drilling of an additional well.

During the early part of 1955 a Mr. Metzenbaum sought information from Mr. Fleming respecting the availability of plaintiffs' land for mineral development. This letter was referred to Calco and the latter replied, stating that the land was under lease; that portions of it had not been fully tested and concluded that, if Mr. Metzenbaum was interested, to please contact it. Calco did not hear from Metzenbaum until August 6, 1955, following the deadline given by plaintiff for the drilling of other wells.

In April of 1955, an independent oil operator, a Mr. Dunnam, contacted Mr. Fleming about the possibility of leasing the entire southern area of the plantation and was referred by him to Calco for further discussion. Dunnam was willing to pay Fleming a ⅙th royalty (the Calco lease provided a ⅛th royalty) and offered a 90-day drilling clause. Calco discussed the possibility of a "deal" with Dunnam but never did hear from him after their meeting. Later, Dunnam dealt directly with Fleming and plaintiffs have given him a tentative lease which covers the northern part of the property [1] providing for a ⅙th royalty. The validity of this lease is, of course, dependent on plaintiffs' success in the suit.

In order to determine whether Calco has reasonably developed the large tract under lease, it is necessary to evaluate the way it has conducted its entire operation in the field; what it has done in the past and measures taken by it looking towards the future. In addition to drilling 30 producing oil wells on the leased premises, it has also drilled four dry holes on the property and seven other dry holes have been drilled on adjacent property which would have had a direct effect on the leased premises. Two dry holes have been drilled which would have had an indirect effect on the leased land. Calco com-

1. At the time Dunnam contacted Calco, he was interested in a farm out of acre-age in the southern portion of the property.

pleted three producing wells in 1950 and drilled the Fleming State 706 well as a dry hole to a depth of 10,600 feet. This dry hole, which was located at the edge of the southeast corner of the tract, would have established an entirely new producing area had it been completed as a producer of oil in paying quantities.

Calco drilled Fleming No. 19 well in the years 1951 and 1952 to a depth of 12,075 feet. This well was located to the southeast, and within the immediate vicinity, of the producing wells and, had it been a producer, might have established a new producing horizon. In any case, it would have undoubtedly greatly extended the then known reservoir.

After the failures encountered by Calco in drilling the two dry holes, Fleming State 706 and Fleming No. 19, the company expended $383,419 in 1952 to deepen Fleming No. 32–1 well for the specific purpose of conducting therefrom a refraction seismograph survey to obtain subsurface geological information to assist it in the development of the Fleming property and other property situated on the same geological structure which it had under lease and extensive study was made of the information secured from this survey, together with the other geological and geophysical data, through the balance of the year 1952 and in the years 1953 and 1954. It was during this period, when Calco was evaluating new geological and geophysical data, that Mr. Douglas R. Fleming began making inquiries respecting further drilling and asked Mr. Betts as to Calco's intentions.

In the Summer of 1954, the geological department of Calco recommended the drilling of a well upon a new area in the northern part of the Fleming property and procured from the production department an estimate that the cost for drilling a well to a depth of 11,500 feet would be $175,000. This recommendation was approved by the management in September, 1954. Pursuant thereto, further geophysical research was made in the field in the Fall of 1954, but the results obtained were not wholly satisfactory and there was considerable discussion by company officials as to the proper location for the well. At that time, Calco was requested by geologists of F. A. Callery to give financial support to the drilling of a well which Callery proposed to drill on adjoining property to the west, across Bayou Barataria. As this presented the company with an opportunity to purchase valuable information in determining the exact location for the well it proposed to drill on the Fleming property, a written contract was made with Callery on December 28, 1954, whereby Calco agreed to contribute $50,000 to the cost of drilling the well (later known as Callery-Baird No. 10), if it should be a dry hole, and $25,000 if it became a producer, provided that the well should be

drilled at a location approved by Calco to a stated depth and that Calco be furnished with all information which might be obtained by Callery during the drilling operations. Mr. Fleming was informed of this agreement in the latter part of 1954 and of the purpose in making it.

Thereafter, in the first half of 1955, Mr. Fleming received the inquiries from Metzenbaum and Dunnam, which we have above outlined, and, after Dunnam agreed to lease the northern part of the property and pay a 1/6th royalty, Mr. Betts was told by Fleming that unless Calco worked out a deal "that was as good to me as Mr. Dunnam's offer, I was going to break this lease on every damn acre of land they had under lease, if I could."

The Callery-Baird No. 10 well was completed as a producer on August 20, 1955. During the drilling of the well, Calco had been receiving the geological information for which it had contracted and was evaluating that information so that it might obtain the best location for the well which it proposed to drill upon the Fleming property. As a consequence of this information, Calco changed the location of its proposed well approximately 900 feet to the south of its original site and increased the authorized depth of the well from 11,500 to 12,500 feet and the estimated cost from $175,000 to $239,000.

On July 29, 1955, Mr. Fleming was notified that the location of the well upon the Fleming property had been fixed and that it would be promptly drilled. This notice reached Mr. Fleming after the sixty-day deadline given Calco by plaintiffs in the letter of their attorneys dated May 21, 1955 and, on August 1, 1955, Calco received another letter from plaintiffs' attorneys demanding the delivery of a release of its mineral lease and informing it that this suit would be instituted for cancellation of the contract.

A review of the record, which contains voluminous testimony and exhibits and complex geological and geophysical evidence and findings, does not convince us that the facts presented herein warrant a partial cancellation of the lease.

We are not here confronted with a situation wherein a mineral lessee has made certain exploratory tests and determined therefrom that parts of the leased land do not warrant development by the drilling of a well. In such matters, it is settled that the lessee is bound to release all acreage which he does not intend to develop. The position of Calco in this case, as we understand it, is that the explorations conducted by it, or which have been made by others on adjacent land, give indications that the entire property subject to the lease is valuable and that it intends to drill wells on it.

Plaintiffs' position, on the other hand, seems to be that, since there has been no actual drilling on any of these large segments of land and, in fact, no new drilling operations since 1952, partial cancellation is necessarily in order. But this view, we believe, overlooks the particular circumstances obtaining in the case which show that Calco, throughout the years of the lease, has conducted highly successful operations on the land which have redounded to the common advantage of the contracting parties and, before and since 1952, has continued its explorations by making various tests and drilling, and by contributing to the drilling upon adjacent property, all with the view of securing new production from the leased land.

In this connection it is apt to point out that, considering the large acreage of land covered by the lease, it is apparent that neither the lesser nor the lessee contemplated that an immediate development of all of the land was feasible or practicable. And we think it evident that the parties assumed that the securing of production from all parts of the tract would require considerable time after the initial production was obtained.

The lucrative production secured by the completion of thirty oil wells was undoubtedly a major accomplishment on the part of the lessee and it is plain that plaintiffs, who were receiving better than a quarter of a million dollars per annum in royalties as a result of this operation, did not and had no right to expect that the lessee would continue to drill more wells at an expense of over $200,000 each unless there was a reasonable belief, based on scientific findings, that new and additional production would be obtained. So, with the extensive operation of the completed wells continuing throughout the years, good business judgment required considerable testing and exploration prior to further drilling. As pointed out previously, Calco secured some information from drilling activity that had taken place on neighboring land and six of the wells which were drilled on the perimeter of plaintiffs' property constituted exploration of the property itself or at least were indicative of the potential of the property.

Since 1952, Calco has continuously revised its estimates of the subsurface structure of the Fleming Plantation. These estimates have been obtained by a refraction survey, to which we have adverted, and a reflection survey, which was run in the Fall of 1954.

Plaintiffs contend that, as the surface of their property lies on top of a known piercement salt dome, the only way to find oil is to drill wells and that exploratory measures, such as have been taken by Calco, cannot be regarded as constituting reasonable development.

But, while the evidence shows that there is a salt dome in the vicinity of the Fleming property, we do not think that it clearly indicates the presence of significant amounts of salt below the surface of the entire tract. Actually, the evidence reveals that the subsurface structures are very complicated. This factor, as well as the dry holes which have been drilled on the property and adjacent land, no doubt contributed in large measure to Calco's reluctance in extending its drilling operations before adequate tests were made and until it was able to reach a conclusion from studies of these tests as to the best location for drilling a well. Its cautionary measures of exploration appear, on the whole, to be reasonably justified under the facts presented.

The judgment is affirmed.

HAMITER, J., dissents with written reasons.

HAMITER, Justice (dissenting).

According to the well settled jurisprudence of this court a mineral lessee must develop with reasonable diligence every part of the leased premises, having due regard for the interests of all contracting parties, or surrender the lease. Carter et al. v. Arkansas Louisiana Gas Company, 213 La. 1028, 36 So.2d 26, Eota Realty Company, Inc. v. Carter Oil Company et al., 225 La. 790, 74 So.2d 30 and

Wier v. Grubb et al., 228 La. 254, 82 So.2d 1. In my opinion such requisite has not been satisfied as to the entire 4,600 acres of land involved herein and, hence, the lease of this defendant should be cancelled to the extent of the undeveloped acreage.