Noah S. CUTRER and Nicholas D. Olivier, Plaintiffs,

v.

HUMBLE OIL & REFINING COMPANY, Defendant.

Civ. A. No. 8842–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 20, 1962.

Reuter, Reuter & Schott, Arthur C. Reuter, New Orleans, La., for plaintiffs.

Milling, Saal, Saunders, Benson & Woodward, Andrew McCollam, Jr., Haywood H. Hillyer, Jr., Lawrence K. Benson, New Orleans, La., Bernard J. Caillouet, W. J. McAnelly, Jr., New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

This is the second phase [1] of a long controversy involving an oil and gas lease covering a portion of the West Black Bay field in Plaquemines Parish, Louisiana. Though others are actively interested in the area, the particular dispute here concerns only the landowners and their lessee, the Humble Oil & Refining Company. The lessors want their property returned free of the lease, which they say has expired or should be cancelled for many reasons. The defendant oil company, on the contrary, asserts the continuing vitality of the lease, but claims a right to withhold a substantial portion of the royalties apparently due thereunder until the plaintiffs' title is made secure.

The lease in suit, executed in December, 1953, nominally embraces some 1920 acres.[2] However, all but about one hun-

---

1. See Cutrer v. Humble Oil & Refining Company, E.D.La., 192 F.Supp. 757. The sole issue tendered and decided on the initial trial was plaintiffs' demand for cancellation of the lease for non-payment of all royalties allegedy due. That question was resolved in defendant's favor.

2. This figure assumes that the lease description in terms of governmental quarter-sections intends to include all water bottoms as well as dry land found within the boundaries given, despite the recitation in both the lease and plaintiffs' title deed that only 445 acres are involved. Whatever the merits of this assumption, it may be indulged in for the purpose of this proceeding, since title is not at issue and both parties accept that reading of the lease.

The acreage involved, all in Township 17 South, Range 17 East, is: the NW¼, SW¼ and SE¼ of Section 18; the NE¼

dred acres are submerged, and that is the source of the difficulty. For there is a serious question concerning the plaintiffs' title to the minerals in the water bottoms, which would normally belong to the state.[3] Indeed, even before the lease in suit was entered into, the Gulf Oil Corporation, as a co-lessee from the State of Louisiana under an instrument which it interprets as covering most of the submerged areas here involved,[4] had already drilled producing wells on the leased premises and the state had accepted its royalties.

Under the circumstances, Humble has been understandably reluctant to explore the water bottoms within the lease until the matter is settled. It did nothing until almost the end of the five-year primary term. To keep the lease in force, it paid delay rentals, but postponed drilling. In the meantime Gulf expanded its operations and successfully developed a large portion of the contested area, until the pattern of its wells surrounded the eastern half of Stone Island, one of only two land masses within the lease.[5] At this point, in late 1958, the lease being about to expire, defendant entered into a joint operating agreement with the state's lessees for the development of Stone Island and the immediately surrounding water bottoms, unitized under orders of the Louisiana Department of Conservation.[6] Humble's participation in the portion of this "joint area" within the lease, about 250 acres, was calculated on the basis of the land area only, some 57 acres, on the ground that the water bottoms were excluded from the plaintiffs' lease and were covered by the state lease. Gulf was designated the operator and promptly drilled a well on the eastern half of the Island which was completed

and SW¼ of Section 19; the NW¼, SW¼ and SE¼ of Section 20; and all of Section 31. (According to their complaint, plaintiffs claim ownership of only the north half of the NW¼ of Section 20. Yet, the lease purports to cover the whole of that quarter-section.)

3. See La.Act 727 of 1954, LSA–R.S. 9:-1107, which declares that: "It has been the public policy of the State of Louisiana at all times since its admission into the Union that all navigable waters and the beds of same within its boundaries are common or public things and insusceptible of private ownership * * *." See also, LSA–Const.1921, Art. 4, § 2; La. Acts 106 of 1886, 110 of 1892, 121 of 1896, 153 of 1902, 52 of 1904, 189 of 1910, 54 of 1914, 139 of 1924, 258 of 1926, and 67 of 1932, insofar as here pertinent, now incorporated in LSA–R.S. 56:421; La.Act 258 of 1910, now LSA–R.S. 9:-1101; *Comment*, 30 Tulane L.Rev. 115.

4. The lease in question is that portion of Louisiana State Lease 195, originally dated February 28, 1928, bearing the designation "QQ," presently owned in equal shares by the Gulf Oil Corporation and the Estate of William Helis, Gulf being the operator. The lease covers all state lands and water bottoms in a large tract which includes the areas here involved, except Section 31. It excludes "lands, beds and bottoms" "heretofore disposed of by the State," but Gulf evidently reads plaintiffs' 1911 patents from the state as conveying only the small landed areas within the description of their lease.

5. The eastern half of Stone Island, containing about 57.36 acres, lies in Section 18, T17S, R17E. Plaintiffs' title thereto is not questioned. The only other land mass within the lease is a portion of a small island, about two miles south of Stone Island, in Section 31. Here again, plaintiffs' title is undisputed.

6. Defendant initially attempted to obtain plaintiffs' consent to voluntary unitization of Stone Island and the surrounding water bottoms. Failing in that, the parties to the joint operating agreement applied to the Louisiana Conservation Commissioner for unitization orders. Since plaintiffs did not consent to it, the sharing formula incorporated in the agreement between Humble, Gulf and Helis in no way binds the plaintiffs. Indeed, that agreement itself so provides. Accordingly, there is no merit to plaintiffs' claim that Humble prejudiced their rights by joining in the operating contract with the state's lessees. Nor is the complaint concerning Gulf's presence on the leasehold within the joint area well taken in view of Humble's stipulated right to assign the lease. See also, LSA–C.C. Art. 2725. Defendant's execution of the joint operating agreement affords no basis for cancellation of the lease.

December 18, 1958, one day before the expiration of the primary term of the lease in suit.[7] While all oil sands have not yet been tapped, development of the joint area has progressed rapidly, dual wells having now been completed on each unit.[8]

Just after execution of the joint operating agreement, Humble released to the plaintiffs some 80 acres of water bottoms adjacent to the joint area which Gulf had already developed. And shortly thereafter the plaintiffs filed an ejectment proceeding in a Louisiana court[9] to evict Gulf from this acreage and other portions of the lease in suit,[10] including the joint area. As to the water bottoms,[11] Gulf defends asserting a right to possession under the state lease. The controversy still pends. In still other proceedings in another state court,[12] the present plaintiffs sought to quiet their title as against a group of persons and corporations, referred to as the Perez Group, who claimed all of the acreage here involved under tax sales and had granted a mineral lease to Helis. In this they succeeded, obtaining a consent judgment recognizing their ownership in return for conceding their opponents small mineral royalties.[13] And, a month thereafter, on March 9, 1959, they filed

7. The argument has been advanced that drilling and production by Gulf, rather than Humble, did not maintain the lease in effect beyond the primary term. But, since Gulf was acting, at least in part, as Humble's assignee, its operations must be attributed to the lessee.

The Louisiana Supreme Court having at length decided that a mineral lease is not a servitude and that the rule of Lee v. Giauque, 154 La. 491, 97 So. 669, is accordingly inapplicable, Reagan v. Murphy, 235 La. 529, 105 So.2d 210, overruling Arent v. Hunter, 171 La. 1059, 133 So. 157, failure to drill non-contiguous tracts within the prescriptive period would not automatically work a forfeiture of the lease as to the detached areas. However, as later noted, the Louisiana rule that every portion of the leasehold must be developed under penalty of partial cancellation may often dictate the same result after expiration of the primary term.

8. By May, 1959, dually-completed wells in the two lower sands were producing in each of the seven 40-acre units affected by the lease. Two shallower potentially productive sands are not yet drilled; but, in the absence of drainage, that accords with the usual practice. The doctrine of Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26, and subsequent cases, to the effect that a lessee must test and develop every part of the leasehold, regardless of what a prudent operator would do, under penalty of partial cancellation, has not yet resulted in horizontal cancellation of a lease, and this court will not initiate that novel application. See Conger, The Evolution of the Further Development Requirement Under Mineral Leases, in Seventh Annual Institute on Mineral Law (L.S.U.1960), 149, 169.

9. Noah S. Cutrer and Nicholas D. Olivier v. Gulf Oil Corporation, Civil District Court for the Parish of Orleans, Louisiana, No. 366–650, filed November 13, 1958.

10. The demand covers the three quarter-sections of Section 18 within the lease. For reasons not explained, the suit does not seek to evict Gulf from those portions of the lease in Sections 19 and 20 which that company is developing.

11. While Gulf's supplemental answer in that proceeding, filed here only on the second trial, does not distinguish between its right to explore Stone Island and its right to explore the surrounding water bottoms in the joint area, that company's steadfast position appears to be that it holds the water bottoms under the state lease, and not as operator for Humble under plaintiffs' lease. It is on this basis that, together with Helis, it receives all production attributable to the water bottoms, to the exclusion of Humble, under their joint operating agreement.

12. Noah S. Cutrer, et al. v. Manning Oil Corporation, 25th Judicial District Court for the Parish of Plaquemines, Louisiana, Nos. 4737, 4738, filed July 16, 1958.

13. Helis, the lessee from the Perez group, was not joined in the suit and his lease was not mentioned in the consent decree. Later, by quit-claim, plaintiffs purchased from the Perez group their rights as lessors under this instrument. Apparently able to convince Humble of the continuing vitality of the Perez lease, Helis subsequently obtained from Humble

the instant suit. About a week later, defendant tendered plaintiffs the royalties attributable to the landed portion of the lease within the joint area.[14] They were refused, as they·have been on the occasion of a more recent tender. And there the matter rests.

Under the uncontroverted facts, it is perfectly clear that Humble has in effect disclaimed all interest in those portions of the leased premises lying outside the joint area. It never received possession of one large area of water bottoms, Gulf having already developed the tract before the lease in suit was entered into.[15] Though defendant probably could have attempted to evict the state's lessee,[16] so could the plaintiffs, and it was clearly their duty to do so.[17] Other water bottoms were only developed by Gulf after Humble obtained its lease.[18] As to these it can be said that Humble abandoned the premises to the adverse possessor or, on the other hand, that plaintiffs failed to defend their lessee's possession, as they should have.[19] But it does not matter who was right and who wrong. All areas pres-

ently under development by Gulf have, as a matter of fact, escaped from the lease. Equity requires that they be formally released to the plaintiffs free of the incumbrance. And since Humble obviously cannot fulfill its lease obligations with respect to these water bottoms within the foreseeable future, there is no reason to delay the declaration of a release.

The situation is a little different, however, with respect to those portions of the leasehold outside the joint area which no one has developed. These are primarily two non-contiguous tracts, one of which includes part of an island undisputedly owned by the plaintiffs.[20] They are unproven areas. Indeed, there is no evidence whatever that prudent development of the lease would require drilling there at this time, and no witness was produced to say that he would drill.[21] Nevertheless, under the now settled jurisprudence of Louisiana, Humble has an obligation to explore within a reasonable time or suffer a partial cancellation of its lease.[22] Normally that penalty would be assessed without fur-

a one-sixth interest in the production attributable to the portion of Stone Island within plaintiffs' lease.

14. Plaintiffs' complaints with respect to the timing and form of this tender have already been rejected. See Cutrer v. Humble Oil & Refining Company, supra, 192 F.Supp. 757, n. 1.

15. By December, 1953, Gulf had completed six producing wells scattered over the three quarter-sections of Section 20 within plaintiffs' lease.

16. See LSA–R.S. 9:1105; LSA–C.C.P. Art. 3664.

17. See LSA–C.C. Arts. 2692, 2704.

18. These are the portions of the leasehold in Section 18 outside the joint area (including the tract later released), the northern portion of the NE¼ of Section 19, and the water bottoms in Section 20 not yet developed by Gulf.

19. See LSA–C.C. Arts. 2692(3), 2704.
   Despite plaintiffs' denial, the evidence

makes it clear that they knew of Gulf's encroachments. Accordingly, the rule of LSA–C.C. Art. 2724, is inapplicable, and Humble cannot be held accountable for the minerals removed by Gulf. Plaintiffs' demand in this particular must be denied, without prejudice, of course, to a proper action against Gulf.

20. The unexplored areas are:
   (1) Section 31, detached from the rest of the leasehold, which includes perhaps 50 acres of land;
   (2) The SW¼ of Section 19, which touches the main lease area at one corner only; and
   (3) The southern half of the NE¼ of Section 19.

21. See Carter v. Arkansas Louisiana Gas Co., supra; Romero v. Humble Oil & Refining Co., E.D.La., 93 F.Supp. 117, modified and affirmed, 5 Cir., 194 F.2d 383.

22. Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30; Wier v. Grubb, 228 La. 254, 82 So.2d 1; Nunley v. Shell Oil Company, 229 La. 349, 86 So.2d 62,

ther ado in view of the long delay since the expiration of the primary term and demand.[23] And this perhaps even in the face of the "judicial ascertainment clause." [24] But here, by filing this suit asserting forfeiture of the lease on several grounds within three months after the expiration of the primary term, plaintiffs have confused the picture, and defendant should be given a clear opportunity to develop the lease free of doubt concerning its continued vitality. Accordingly, Humble will be granted ninety days to initiate a development program affecting the unexplored portions of the leasehold outside the joint area.[25]

■ There remains the tract of land and water bottoms now being developed under the joint operating agreement between Humble and the state's lessees.[26] Here Humble cannot say that it was denied possession, since no part of the joint area was held by Gulf at the time the operating agreement was entered into. Whether defendant could, or could not, have developed it peacefully without entering into an arrangement with the state's lessees we will never know. But, at least, Humble cannot now label Gulf's possession adverse, and we must treat

Gulf merely as the operator developing on behalf of Humble. Why then should Humble not pay full royalties to plaintiffs on all minerals removed from the area? Because, says Humble, the water bottoms in the joint area [27] are "claimed" by the state and the lease expressly provides for the withholding of royalties attributable to such portions of the premises as are "claimed by others" "until final determination of the Lessor's rights."

In an earlier opinion,[28] this court refused to cancel the lease on account of the withholding of royalties from the submerged portions of the joint area. That ruling was based on the finding that Humble's refusal to pay the royalties was at worst erroneous. But the question whether royalties attributable to the water bottoms were actually due was left open. Now, in the light of new evidence,[29] and on fuller consideration, the court is persuaded that defendant should not be compelled to assume the risk of making these royalty payments until plaintiffs' title to the submerged portions of the lease is confirmed.

As already noted after the first hearing in this matter,[30] the language of the

---

affirming, La.App., 76 So.2d 111; Sohio Petroleum Company v. Miller, 237 La. 1015, 112 So.2d 695; Middleton v. California Company, 237 La. 1039, 112 So. 2d 704.

23. Unlike Salyer v. California Company, E.D.La., 164 F.Supp. 287, affirmed, 5 Cir., 262 F.2d 589, there was here no drilling by the lessee in the immediate vicinity of the undeveloped portion of the leasehold. Nor was there even exporation, combined with a long-range development plan which would ultimately include the contested area, as in Middleton v. California Company, supra.

24. See Melancon v. Texas Company, 230 La. 593, 89 So.2d 135, 146.

25. See Fontenot v. Texas Company, 5 Cir., 266 F.2d 956, modifying and affirming, W.D.La., 168 F.Supp. 36.

26. The joint operating agreement affects the whole of Stone Island and surround-

ing waters. But the plaintiffs are interested only in that portion of the joint area lying east of the range line in Section 18, T17S, R17E. The term "joint area" as here used refers to that portion alone.

27. The "claim" to water bottoms is not limited to those in the joint area. But, since this is the only portion of the leasehold presently under development by Humble, or for the account of Humble, no question arises concerning the right to withhold royalties attributable to water bottoms outside the joint area.

28. See Note 1, supra.

29. Especially Gulf's supplemental and amended answer in the pending state court proceedings, see Note 9, supra, asserting a right under the lease from the State of Louisiana.

30. See Cutrer v. Humble Oil & Refining Company, supra, 192 F.Supp. 758.

state lease itself is ambiguous in excluding from its coverage all lands and water bottoms "heretofore disposed of." But the state's lessees, with their landlord's concurrence, have made it plain that they interpret this provision as excepting only the land areas involved. And that contention is far from frivolous. Indeed, considering the ambiguity of the description in plaintiffs' title [31] in the light of the constitutional and statutory impediments to alienation of water bottoms [32] existing at the time plaintiffs' ancestors obtained their patents, it may be they never acquired the submerged portions of the lease. Gulf is apparently so sure of the state's title to these water bottoms that it has not hesitated to drill areas nominally covered by plaintiffs' lease, and Humble is so doubtful of its lessors' title that it has, as a practical matter, abandoned its claim to them, at least in the joint area.

All this, however, does not necessarily mean that an adverse "claim" exists within the meaning of the lease provision. On the contrary, as indicated in a prior opinion, that term must probably be understood restrictively as including only a claim judicially asserted,[33] and Gulf's answer in the state court eviction suit asserting the state's title to the water bottoms may not be sufficient. Nevertheless, because there is no protection for a mineral lessee who pays royalties erroneously on minerals produced from state lands,[34] and because the state proceedings presently pending between plaintiffs and Gulf may soon resolve the basic title question, defendant should not now be required to pay over to the plaintiffs royalties attributable to the submerged acreage within the joint area. Equity, however, requires that these royalties be paid into escrow, under mutually agreeable provisions for investment of the funds. Accordingly, as soon as an escrow plan can be established, Humble will deliver all accrued royalties attributable to the joint area water bottoms within the lease, and will henceforth pay into that fund all such royalties,[35] at least quarterly, until such time as the plaintiffs' title is quieted or defeated, or until the further orders of the court. The court will retain jurisdiction of the case for reconsideration should anything prevent a prompt adjudication of the title question by the state tribunals.[36]

31. See Note 2, supra. The advertisements and the sheriff's deed covering the public sale to plaintiffs' ancestors in title, just prior to issuance of the patents in 1911, also recite only 445 acres. The only plat then extant, approved in 1848, shows a lesser land area.

32. See Note 3, supra. It is not at all clear that the rule of California Co. v. Price, 225 La. 706, 74 So.2d 1, and its progeny, quiets plaintiffs' title to all the water bottoms within the 1920 acre description of the patents. It may be that only the 445 acres apparently then thought to be above water are protected. Moreover, any portion of that acreage which became submerged after issuance of the patents in 1911 presumably reverted to public ownership. See Miami Corporation v. State, 186 La. 784, 173 So. 315.

33. Cutrer v. Humble Oil & Refining Company, supra, 192 F.Supp. 758, n. 4.

34. The protection afforded mineral lessees on private lands when they pay royalties to the record owner, absent a judicially asserted adverse claim, LSA–R.S. 30:105, 30:106, is expressly withheld in the case of state lands. LSA–R.S. 30:108.

35. Both accrued and future royalties attributable to the landed portions of the joint area within the lease in suit should, of course, be paid directly to the plaintiffs.

36. It may be that the fundamental title question cannot be resolved in that proceeding against one of the state's lessees. Though the lessor, the State Mineral Board, is amenable to suit, LSA–R.S. 30:121; Texas Co. v. State Mineral Board, 216 La. 742, 44 So.2d 841, the state itself, presumably immune in the absence of consent, is perhaps an indispensable party in the title dispute. See Daigle v. Pan American Production Company, 236 La. 578, 108 So.2d 516.