495 So.2d 1008 (1986)
Florence Streater TAUSSIG, et al., Plaintiffs-Appellees,
v.
GOLDKING PROPERTIES CO., et al., Defendants-Appellants.
No. 84-1020.
Court of Appeal of Louisiana, Third Circuit.
October 15, 1986.
Rehearing Denied October 30, 1986.
*1009 Gordon, Arata, Etc., John M. McCollam, New Orleans, Jones, Jones and Alexander, Jerry G. Jones, Cameron, Liskow and Lewis, Robert T. Jorden and Patrick W. Gray, Lafayette, for defendants-appellants.
Stockwell and Associates, William E. Shaddock, Lake Charles, for plaintiffs-appellees.
Before FORET, KNOLL, and MOUSER,[*] JJ.
KNOLL, Judge.
GoldKing Properties Company (GoldKing), American Petrofina Company of Texas (American Petrofina), Mobile Oil Exploration & Producing Southeast, Inc. (MOEPSI) and Sun Exploration and Production Company (Sun Exploration), together with other lessee-owners of minority mineral interests (hereafter collectively referred to as appellants), appeal the trial court's judgment partially cancelling an oil, gas, and mineral lease (hereafter Mallett Bay Lease), dated March 20, 1941, covering a mineral servitude in their favor as lessees which encompasses one-half (½) the minerals owned by the plaintiffs, Florence Streater Taussig, et al. (hereafter plaintiffs), affecting 1500 acres of land located in Cameron Parish. The trial court ruled that American Petrofina, the appointed operator of the lease, actively breached the lease, entitling plaintiffs to receive a partial cancellation of the Mallett Bay Lease, damages of $263,718.88 for their inability to enter a new oil, gas and mineral lease when defendants refused to grant a release, and attorneys' fees and expenses of $175,000.
Defendants contend that the trial court erred: (1) in denying defendants' dilatory exception of prematurity, holding plaintiffs were not required to place defendants in default as a prerequisite to a suit for lease cancellation; (2) when it rejected defendants' plea of estoppel and waiver based on the failure of the Mallett Bay owners to timely protest the lack of development of the Mallett Bay lease; (3) in granting the Mallett Bay lessors lease cancellation on the basis that the lease was outdated and economically disadvantageous to the lessors; (4) in awarding the Mallett Bay lessors damages of $236,718.88 plus interest from the date of judicial demand based on the assumption that the lessors lost the ability to enter into new oil, gas and mineral leases covering their one-half interest in the mineral servitude covered by the 1941 Mallett Bay lease; (5) in awarding lessors and their attorneys reimbursement for attorneys' fees and expenses totaling $175,000; (6) in concluding GoldKing and its co-venturers were not entitled to rely on the public records which showed that *1010 American Petrofina held a valid mineral lease from the Mallett Bay lessors; (7) in casting GoldKing solely liable for all damages, expenses and attorneys' fees; and (8) in assessing all costs of litigation to GoldKing and its co-defendants.

FACTS
On January 12, 1933, Mallett Bay Land Company, Inc. (Mallett Bay Company) conveyed 1500 acres located in Cameron Parish, Louisiana (hereafter subject lands) to Andrew S. White, reserving one-half (½) of the oil, gas and minerals. On March 20, 1941, Mallett Bay Company granted a mineral lease to L.L. Beeson covering its one-half (½) mineral interest in the subject lands. On March 25, 1941, Andrew S. White separately granted a mineral lease to L.L. Beeson covering his one-half (½) mineral interest. Each lease provided lessors with a one-eighth (1/8) royalty interest, and neither lease contained a Pugh clause.
In 1951 the Mallett Bay Company was liquidated and its stockholders acquired the mineral rights previously owned by the company to the subject lands.
Through the years various lessees acquired the two Beeson leases through assignment. Eventually American Petrofina became operator of the Beeson leases in 1966 as part of a purchase and assignment of mineral interests from Graridge Corporation. In addition to American Petrofina, the major co-owners of the leases were Transocean Oil, Inc., whose interest was later acquired by MOEPSI, and Texas Pacific Oil Company, Inc., whose mineral interest was later acquired by Sun Exploration. Nineteen persons and entities actually owned the working interest of the two Beeson leases at the time of this litigation, but the major owners were American Petrofina, MOEPSI and Sun Exploration.
In 1975 a thirty (30) acre portion of the subject lands covered by the two Beeson leases was unitized within the "L" Sand, Reservoir A by order of the Louisiana Office of Conservation. This unit was created for a well physically located on property adjoining the subject lands which was producing gas and condensate in commercial quantities. At the time of this unitization order there were five (5) commercially producing wells on the premises covered by the Beeson leases which were developed between 1941 and the early 1970s. In March 1977 the five wells on the subject lands ceased production, and only that thirty (30) acre portion of the leased premises which was part of the compulsory unit remained under production. In 1979 the five non-producing wells (the A.S. White Wells Nos. 1-5) on the land covered by the two Beeson leases, all lying outside the compulsory unit, were plugged and abandoned. After the five A.S. White wells were plugged and abandoned, the remaining acreage covered by the Beeson leases was maintained by production from the thirty (30) acre tract which formed part of the compulsory unit.
On May 22, 1979, James M. Burlingame, a Louisiana attorney, wrote American Petrofina on behalf of Mrs. Andrew S. White and Cornell University, heirs and legatees of Andrew S. White, demanding a release of the original Andrew S. White lease because of the mineral lessees' failure to develop the leased premises. After Burlingame sent a second demand on August 3, 1979, American Petrofina, as lease operator, recommended to its major co-owners that they grant a partial release of the original White lease of all the non-unitized acreage to avoid possible litigation. On September 4, 1979, American Petrofina and its major co-owners executed a release of the original Andrew S. White lease, excluding the thirty (30) unitized acres.
On January 25, 1980, GoldKing, operating through its representative, Raymond J. Dixon, Jr., acquired a new mineral lease from Mrs. Andrew S. White and Cornell University covering the mineral interest earlier released by American Petrofina and its mineral co-owners. This new lease granted the lessees a one-quarter (¼) royalty and contained a Pugh clause.
In July 1980 GoldKing initiated conversations with American Petrofina to obtain a farmout agreement covering the original *1011 Mallett Bay lease still held by American Petrofina and its co-owners.
Meanwhile, on June 19, 1981, Duncan M. Smith, Jr., an attorney representing Ronald Shultz and James Pharis, two individuals who owned a fractional share of the lessors' interest in the original Mallett Bay Company-Beeson lease, demanded in writing that American Petrofina provide them with a recordable release on the subject lands not included in the producing compulsory unit. As a result of GoldKing's interest in obtaining a farmout from American Petrofina, et al., it intervened in the negotiations with Shultz and Pharis. GoldKing's agreement to grant Shultz and Pharis a new lease (with a one-quarter royalty and certain bonus payments) on their mineral interest in the Mallett Bay property, coupled with GoldKing's efforts to obtain from American Petrofina a recordable release of the interest of Shultz and Pharis from the original Mallett Bay-Beeson lease, culminated on June 30, 1982, with the execution by American Petrofina and its major co-owners of a partial release as demanded by Attorney Smith only as to the mineral interests of Shultz and Pharis.
On June 1, 1982, American Petrofina, MOEPSI and Sun Exploration assigned the Mallett Bay-Beeson lease, excluding the thirty (30) acre compulsory unit and the interests of Shultz and Pharis, to GoldKing as a part of a farmout agreement. Under the farmout agreement GoldKing was obligated to drill a 12,000 foot well on the leased property on or before January 25, 1983, under penalty of forfeiture of the lease assignment and the farmout agreement.
On October 25, 1982, I.P. Saal, Jr., an attorney representing most of the remaining owners of the lessors' mineral interests in the original Mallett Bay lease, demanded a release from American Petrofina, et al., of the original Mallett Bay-Beeson lease. American Petrofina referred the Saal demand to GoldKing who advised Saal of the farmout agreement from American Petrofina. Because of its pending plans to drill a well on the subject lands, GoldKing asked that Saal's release demands be withdrawn. Saal's clients refused.
As operator and working interest partner with GoldKing and The Stone Petroleum Corporation (Stone), Lamson Onshore Petroleum Corporation (Lamson Onshore) drilled the Lamson/Onshore A.S. White No. 1 Well on December 6, 1982, on the subject lands, which cost $3,362,300. On March 14, 1983, this well was plugged and abandoned as a dry hole. Thereafter, on May 13, 1983, GoldKing in participation with Lamson Onshore, drilled the Lamson/Onshore Clair Marceaux Well No. 1 on adjoining property to the north of the subject lands. This well was completed as a well capable of producing gas and condensate in commercial quantities, and on December 18, 1983, a geographical unit was formed which included a portion of the subject land equal to 42% of the total unit area.
Those persons represented by I.P. Saal, Jr. initiated this litigation on March 15, 1983, seeking partial cancellation of the original Mallett Bay-Beeson lease, damages and attorneys' fees.

PREMATURITY
American Petrofina, its co-owners and assignees contend that they neither abandoned nor failed to develop the original Mallett Bay lease. They argue that plaintiffs' action was premature because a necessary predicate to their action, a placing in default as contemplated by LSA-R.S. 31:135, was not effected prior to the initiation of this suit.
They filed a dilatory exception of prematurity which was overruled by the trial court. In its oral reasons for judgment on the dilatory exception, the trial court stated:

"Thus, if the landowner is going to file a suit to cancel because of the mere failure to develop, it must be shown that he had put the leaseholder on notice that he did not agree with the progress of development or absence of any development. The phrase `mere failure to develop' in this rule is significant. *1012 This is not what we have in this case.... The facts show that here Petrofina was in a situation at one time when its management of the lease could have been characterized as a mere failure to develop. But things began to happen. The wells which were on the property just weren't paying off, so Petrofina went in and plugged the wells. An then, of course, Mr. Burlingame wrote them for the White and the Cornell University interest, and Petrofina divested itself of one-half of the rights they had on this property.... Petrofina's action was a significant change of position, and although there may be some argument, and maybe good argument, produced later that it could have developed the property even though it only owned the one-half or it could have made arrangements with the other new lessees of the White and Cornell interests, nevertheless, Petrofina certainly placed itself in a disadvantageous position; because now it has to rely upon the goodwill and the actions of other parties. It made its task of development more difficult by reducing its leasehold to one-half of the mineral estate. This is an act which, if actionable, is not a passive breach, and should be the basis for the landowners to test Petrofina's failure to develop without the prerequsite [sic] of the technical putting in default. In this case it becomes supertechnical to say please now develop the land, when what Petrofina has done is apparently put themselves in a situation where further development was highly unlikely. And, of course, the subsequent incident with Pharis and Schultz [sic] underscores Petrofina's problems created by the divestiture... [T]he releases upon demand definitely constitute positive action and are active and not passive. The exception of prematurity is not well taken."

In its written reasons for judgment rendered after trial on the merits, the trial court stated:
"In an oft-quoted opinion of 1948 the Louisiana Supreme Court stated:

`the law of this state is well settled that the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lease [sic] must develop with reasonable diligence or give up the contract; ... having due regard for the interest of both contracting parties.' Carter v. Arkansas Louisiana Gas Company [213 La. 1028], 36 So.2d, 26 (La.1948).

It is equally well settled that the breach of the obligation to reasonably develop a mineral lease, whether the obligation is implied or express, does not result in the automatic termination of the lease. As the court stated in the Carter case, a suit based upon the failure to reasonably develop is subject to a determination based upon the particular circumstances of each case. Furthermore, what constitutes a reasonable development is governed by what ordinarily prudent persons under similar circumstances would expect. In the case of Waseco Chemical and Supply Company v. Bayou State Corporation, 371 So.2d 305 (2d Circuit, 1979), the Court quoted extensively from Professor Litvinoff from the work 7 Litvinoff, Louisiana Civil Code Treatise, Book Two. It pointed out that the cancellation of a lease is a harsh remedy not to be granted without serious considerations. Those considerations which the Court should make before pronouncing dissolution are: 1) extent and gravity of the failure to perform, 2) nature of the obligor's fault, 3) good or bad faith of the parties, and 4) surrounding economic circumstances....

On February 2, 1979 C.R. Carswell, district manager for Fina, was given a written `request for authority to plug and abandon' form which affected the existing wells on the subject property. In the portion of that office form which provides for a narrative on the detailed reasons for the action, the following language is typewritten:

*1013 `No possibilities of commercial oil or gas production. Wells should be plugged and abandoned. This will be a lease abandonment-not under oil payment.'

Right below this within the same space is the writing in long hand:
`acreage will be held by LRASUA.'
Defendants contend that the phrase `lease abandonment' does not mean what it says and that there was no intention on the part of Fina to halt development of the subject property. It was suggested that the term `lease abandonment' really was a loose term synonymous with the plugging of the existing wells which were no longer producing at a profitable level. Defendants take the same position regarding other references to an abandonment made in some of Fina's interoffice memos which were filed into evidence.
The language of these communications is not conclusive on the issue of non-development of the lease. But a review of the total case leads the court to the conclusion that Fina had, in fact, abandoned the property in question and the accumulated actions of this operator constituted a breach for which the plaintiffs are entitled to relief.

Our Supreme Court addressed this issue in Middleton v. California Company [237 La. 1039], 112 So.2d 704 (La.Sp. Ct., 1959). It stated that when an operator has concluded that development in an area is unprofitable and no plans for development are contemplated:

`... it is settled that the lessee is bound to release all acreage which he does not intend to develop'. (id. [112 So.2d] at pg. 709)
While it may be true that others were viewing the subject property with some interest toward mineral development, Fina and its partners intended to hold the leased acreage without a plan of development as early as March 1977 when all production ceased and, evidently, for some time before that.
Of course, the existing law did not impose a positive duty upon Fina to record releases in favor of all of the lessors until demand was made. Nevertheless, the obligation to develop remained and was breached by Fina's actions and lack of action in regards to the property.
The incident of the Burlingame letter and the subsequent release which reduced the mineral lessee's holdings by one-half was consistent with Fina's official position at that time. It was a ratification through company actions of its position regarding the acreage at that time.
Fina's reluctance to make an immediate release of the interest owned by Shultz and Pharis is understandable because, by that time, possibilities of joint development had gained the attention of Fina's personnel. But again, the release issued to Pharis and Shultz constituted a corporate acknowledgement by Fina regarding the lease. What was acknowledged was that the rights of the lessors under the Mallett Bay Lease were no different from the rights of the lessors under the original A.S. White Lease. The method by which the Pharis-Shultz release was handled revealed the activities by Goldking and others to put together a plan of development involving this property. Nevertheless, the court is of the opinion that the breach of the contract had already occurred through the neglect and eventual abandonment of the lease and neither the efforts by Fina nor its assigns could revitalize the lease and deny to the plaintiffs their remedy."
Pertinent to this case are the following articles of the Mineral Code:
LSA-R.S. 31:122

"A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of *1014 himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee."

LSA-R.S. 31:135
"The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases subject to the following modifications."
As a necessary corollary to R.S. 31:135 the following Civil Code articles are also applicable:
LSA-C.C. Art. 1931
"A contract may be violated, either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract."
LSA-C.C. Art. 1932

"When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action."
LSA-C.C. Art. 1933
"When the breach has been passive only, damages are due from the time the debtor has been put in default, in the manner directed in this chapter...."
We have carefully reviewed the trial court's reasons for judgment, which reflect thorough and conscientious reasons. However, in some portions of the court's reasons it based its decision to cancel the Mallett Bay lease on American Petrofina's non-development of the lease, culminating with its release of the original A.S. White lease; in other portions, it characterized American Petrofina's actions as an abandonment of the original Mallett Bay lease. In an attempt to clarify its holding, the trial court stated, "The court has characterized Fina's handling of the leased premises as an abandonment. Nevertheless, the abandonment which the court described was simply an extreme example of the failure to develop and does not fall into a separate legal category." (Emphasis added.) Therefore, we perceive the trial court's reasons for ordering a partial lease cancellation because American Petrofina's failure to develop coupled with its voluntary release of the original White lease, transformed its passive breach of the implied obligation to develop the subject lands into an active one. Therefore, the trial court concluded that it was not necessary for the plaintiffs to place the appellants in default before seeking judicial cancellation of the Mallett Bay lease. This we hold was erroneous.
After production in paying quantities has been obtained from a mineral formation, it is the duty of the lessee to develop the producing formation as a reasonably prudent operator, taking into consideration both his own interests and those of the lessor. To fulfill the development duty under the law, a lessee has the obligation to develop known mineral producing formations in the manner of a reasonable, prudent operator and to explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonable, prudent operator. Vetter v. Morrow, 361 So.2d 898 (La. App. 2nd Cir.1978). Public policy dictates the necessity of the principle of "reasonable development" to give effect to the parties' intent in confecting a mineral lease, to assure the reasonable development of Louisiana's natural resources, and to prevent the removal of property from commerce. Dawes v. Hale, 421 So.2d 1208 (La.App. 2nd Cir.1982). Therefore, under R.S. 31:122 there is an implied covenant of every mineral lease that the lessee has a duty to develop the leased premises.
Since the duty to develop is an implied obligation, the jurisprudence has consistently held that a breach of this duty is passive, and a formal placing in default is required before judicial intervention may be sought. Trinidad Petroleum v. Pioneer Natural Gas, 416 So.2d 290 (La.App. 3rd Cir.1982), writ denied, 422 So.2d 154 *1015 (La.1982); Pipes v. Payne, 156 La. 791, 101 So. 144 (1924). In Pipes, supra, a landmark case in the area of non-development of the lease, the court stated:
"Under these circumstances, we think that plaintiff, before suing to have the contract declared forfeited, should have made demand on defendants to further develop the property, and should have given them a reasonable time within which to have done so. In other words, plaintiff should have put defendants in default. In this connection, it may be observed that it is said in Thornton on Oil and Gas (3d Ed.) Sec. 182, p. 302, that:
`If the lessor desires to declare a forfeiture of the lease for the reason that the land has not been fully developed, although the lessee has entered and developed a part of it, he must give notice to such lessee of his intention to declare a forfeiture if the lease is not fully developed, and reasonable time must be given for the development.'"
The purpose of the default requirement in this context is to provide the lessee notice that the lessor considers the lessee's actions (or inaction) as violative of the implied obligation to develop the leased premises, and to afford the lessee a reasonable opportunity to perform its development obligations. Pipes, supra.
In the present case we must consider the following issues relative to development: (1) is a demand to cancel a mineral lease sufficient to constitute a putting in default; and (2) did American Petrofina's actions in granting the release of the original White lease constitute abandonment or an active breach of its duty to develop the leased premises?
The demands of I.P. Saal on October 25, 1982, and Duncan Smith on June 19, 1981, were for cancellation of the Mallett Bay lease rather than lease development. Louisiana jurisprudence has consistently held that a demand for cancellation is not a substitute for a placing in default. In Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583 (1940), the court disposed of the issue and stated:

"The record shows that the defendant lessees are in possession of the property and are operating one producing oil well. Plaintiffs do not allege that they made any demand for further development or that they put the defendant lessees in default. In the absence of allegations and proof to that effect, plaintiffs are not entitled to have the leases cancelled on the grounds of failure to reasonably and further develop the leased premises. Pipes v. Payne, 156 La. 791, 101 So. 144 [1924]; Hiller v. Humphreys Carbon Company, 165 La. 370, 115 So. 623 [1928]; and Temple v. Lindsay, 182 La. 22, 23, 161 So. 8 [1935]. Plaintiffs contend that it was unnecessary to prove that demand was made for further development and that the defendants were placed in default, because their attorney, on October 11, 1937, wrote the defendants a letter demanding a release of the oil and gas leases held by them, citing Stockelback v. Bradley, 159 La. 336, 105 So. 363, 364 [1924]. The letter demanded the cancellation of the leases and made no request for reasonable development of the land. In the above case cited by counsel, the court stated: ` * * * It is well settled that where a party refuses, and does not merely fail or neglect, to comply with his obligation, the other party need not formally put him in default.' In the instant case, defendant lessees have not refused to comply with any implied obligations but have simply refused to cancel the leases." (Emphasis added.)

Accordingly, we conclude that the lessors under the original Mallett Bay lease did not place appellants in default on the strength of the Smith and Saal letters which demanded a release.
The plaintiffs persuasively argued to the trial court that American Petrofina abandoned the Mallett Bay lease when it "plugged and abandoned" the five non-producing A.S. White wells, and when it released the one-half mineral interest to the subject lands it held under the original A.S. White lease.
*1016 Though there is no provision in the Mineral Code which directly addresses "abandonment" in the context of mineral law, Bickham v. Bussa Oil and Gas Co., 152 So. 393 (La.App. 2nd Cir.1934), held that the party asserting abandonment must prove (1) an act of abandonment and (2) the intent to abandon the property. Since there is no provision in the mineral code for abandonment, we may look to the Civil Code for its general treatment of abandonment. LSA-R.S. 31:2; see also Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679 (1952).
Abandonment was defined in Salim v. Louisiana State Board of Education, 289 So.2d 554 (La.App. 3rd Cir.1974), writ denied, 293 So.2d 177 (La.1974), as follows:

"`Abandonment' of property or of a right is the voluntary relinquishment thereof by its owner or holder, with the intention of terminating his ownership, possession and control, and without vesting ownership in any other person. Powell v. Cox [92 So.2d 739 (La. App. 2 Cir.1957)], supra; New Orleans Bank & Trust Co. v. City of New Orleans, 176 La. 946, 147 So. 42 (1933)."

Plaintiffs based their abandonment argument on the physical plugging of the five A.S. White wells in 1979, the accompanying internal memoranda of American Petrofina regarding such activity, and the release granted to Mrs. A.S. White and Cornell University.
We find that the physical plugging and abandonment of the five wells does not constitute proof of abandonment of the Mallett Bay lease. These wells were required to be plugged and abandoned by the regulations of the Louisiana Department of Conservation because they no longer produced condensates and hydrocarbons in paying quantities. Therefore, we conclude that the physical plugging of the wells does not support any elements of abandonment.
To further strengthen their argument that the plugging of the defunct A.S. White wells constituted legal abandonment of the Mallett Bay lease, plaintiffs call attention to two American Petrofina interoffice memos. The first typewritten memo dated February 2, 1979, from W.F. Barthelemy to C.R. Carswell, American Petrofina's general manager of drilling and production, stated, "No possibilities of commercial oil or gas production. Wells should be plugged and abandoned. This will be a lease abandonment. LEASE ABANDONMENTNOT UNDER OIL PAYMENT." Just below that handwriting was the statement, "Acreage will be held by LRASUA [the 30 acre portion of the subject land which formed part of the off-site compulsory unit]." The second memo dated February 9, 1979, an "Authority for Retirement of Capital Assets" states, "Lease abandonmentNot under oil payment. Wells are TA and have no possibilities for recompletion in other zones. Recommend wells be plugged and lease abandoned."
In response to plaintiffs' assertions, C.R. Carswell testified that it was the intent of the memos that only the wells were to be abandoned, not the leases; as evidence of that intent he pointed out the handwritten section in the first memo which stated that the leases would be maintained by the 30 acres of the subject lands included in the compulsory unit. He explained that persons in different sections of the oil industry often use the term "lease" loosely "referring to a geographical location and the physical property, the wells, the tank battery, etc. And [it was] the context of this... we were talking about the physical presence of those wells, that equipment and that geographical location."
After considering this evidence, the trial court stated that these internal communications were inconclusive on the issue of lease non-development. We agree.
Against this backdrop, however, the trial court injected the September 4, 1979, release American Petrofina granted Mrs. A.S. White and Cornell University, and concluded that this action evidenced its intention to abandon the original Mallett Bay lease. The trial court opined that American Petrofina placed itself in a situation that by voluntarily releasing one-half the minerals, it made it highly unlikely for development to take place because now it *1017 had to rely on third parties to accomplish this task. Thus the trial court concluded American Petrofina actively breached the original Mallett Bay lease, abandoning it. In all due deference to the learned trial court, we disagree with its conclusion.
It cannot be ignored that the mineral servitudes granted originally by A.S. White and the Mallett Bay Company were separate contracts which contained no self-operating resolutory conditions regarding the lessee's development obligations or the interconexity of the two leases. When American Petrofina and its major co-owners relinquished their rights to the original A.S. White lease they did not per se forfeit their rights established by the separate mineral contract granted by the Mallett Bay Company in 1941. Frank Carr, American Petrofina's director of special projects, interpreted the Burlingame demand on behalf of Mrs. A.S. White and Cornell University and its resulting release as strictly a relinquishment of their rights to the A.S. White lease. C.R. Carswell, American Petrofina's director of drilling and production, further testified about his discussions with Carr regarding the effect that the White release would have on the Mallett Bay lease. They concluded, as evidenced by correspondence between them, that they wanted to maintain their undivided one-half (½) mineral interest held through the Mallett Bay lease, and that the 1975 compulsory unit would hold the Mallett Bay lease until they could conclude their ongoing plans to drill a deep well on the subject property through a farmout agreement. In the context of legal abandonment, the element of an intent to abandon the separate lease obligations of the Mallett Bay agreement is glaringly absent.
The same reasoning holds true regarding American Petrofina's subsequent release of Shultz and Pharis. The record supports that there was no intent to abandon the Mallett Bay lease. When Shultz and Pharis made demand for a release, American Petrofina was processing the GoldKing farmout. Only in an attempt to salvage this development effort through a farmout to GoldKing were Shultz and Pharis released from the original Mallett Bay lease.
Underlying the trial court's opinion is an ever pervasive argument that American Petrofina's relinquishment of the A.S. White lease made its ability to perform under the Mallett Bay lease more difficult because it no longer was the leaseholder of 100% of the mineral interests in the subject lands. The trial court concluded that to require plaintiffs to place appellants into default would have been a vain and useless gesture. This reasoning is based on an exception to the default requirements recognized in the comments to R.S. 31:135. The comments state in part:

"[I]f a party who has breached a contract and would otherwise be entitled to be placed in default either denies the existence of his obligation or refuses to perform it, the damaged party is not required to place him in default as a prerequisite to an action for dissolution or damages, or both. The expression of the decisions is that to require a putting in default in these circumstances would be requiring `a vain and useless thing.' This exception is specifically recognized as applicable in mineral lease cases. E.g., Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30 (1954); Wadkins v. Wilson Oil Corp., 199 La. 656, 6 So.2d 720 (1942)." (Emphasis added.)

Accordingly, the trial court deemed American Petrofina's actions an active breach of the Mallett Bay lease, i.e., it did something voluntarily which placed them in a situation where further development of the Mallett Bay lease was highly unlikely.
In granting the A.S. White release, American Petrofina neither denied its obligations to develop the Mallett Bay lease nor evidenced a refusal on its part to perform its contractual obligations. Although we agree that American Petrofina placed itself in a more difficult position because it was no longer the leaseholder of 100% of the mineral interests, the record does not support that this made American Petrofina's development of the lease highly unlikely. The trial court's reasoning fails to account for the ability of American Petrofina to jointly develop the leased premises *1018 through a cooperative farmout with the new lessees of the A.S. White mineral interests. See Frazier v. Justiss Mears Oil Co., Inc., 391 So.2d 485 (La.App. 2nd Cir. 1980), writ denied, 395 So.2d 340 (La.1980).
In plaintiff's brief, they contend that American Petrofina failed to act as a prudent operator pursuant to LSA-R.S. 31:122. In view of this contention, we feel compelled to address whether American Petrofina breached its duty to act as a prudent operator of the subject lands to such an extent that a judicial dissolution of the Mallett Bay lease was in order, without the necessity of the prerequisite demand to develop. Such a dissolution has its roots in LSA-C.C. Art. 2047 which provides:
"In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a future time allowed for the performance of the condition."
The right to dissolve a mineral lease is subject to judicial control according to the factual circumstances of each case. Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906 (1946). In order to dissolve a mineral lease the breach must be shown to be substantial. Cox v. Cardinal Drilling Company, 188 So.2d 667 (La.App. 2nd Cir. 1966). In Simmons v. Pure Oil Company, 124 So.2d 161 (La.App. 2nd Cir.1960), affirmed, 241 La. 592, 129 So.2d 786 (1961), the court stated:

"Doubtless it is an obligation of the lessee to operate the lease premises to the mutual advantage of itself and the lessor. LSA-C.C. Art. 2710; Prince v. Standard Oil Co. of Louisiana, 1920, 147 La. 283, 84 So. 657; and in a proper case a lessor may maintain an action for dissolution of the contract of lease against his lessee who has failed to act as a prudent administrator of the leased premises. LSA-C.C. Arts. 1926, 2046, 2711 and 2729. Bloom v. Southern Amusement Co., 1955, 228 La. 44, 81 So.2d 763.
Manifestly, every act of omission or commission, no matter how small, will not justify cancellation of a lease on grounds of imprudent administration. The dereliction of duty must be of a substantial nature and cause injury to the lessor."
The record supports that the acts relied upon by plaintiffs are insufficient to justify the dissolution of the Mallett Bay lease on grounds that American Petrofina breached its duty to act as a prudent operator. Under the facts of this case we cannot say that American Petrofina and its co-owners failed to prudently administer the Mallett Bay lease. There were no stated self-operating resolutory conditions in the two leases which exempted either from the demand requirement established by the mineral and civil codes of Louisiana. American Petrofina's actions regarding the release of the A.S. White lease in 1979 were forthright and promptly recorded in the public records of Cameron Parish. Despite this, plaintiffs failed to make demand for development of the subject lands, and further did not make their release demands until October 1982, just prior to the actual drilling of the Lamson/Onshore A.S. White Number 1 Well on the subject lands. American Petrofina developed the subject lands through the implementation of a farmout agreement with GoldKing, and its co-venturers, resulting in the drilling of a deep test well in 1982 on the subject lands which revealed significant geological information, and led to the successful drilling of an off-site producing deep well which benefited the Mallett Bay lessors.
For the foregoing reasons, the judgment of the trial court is reversed and set aside. Appellants' exception of prematurity is sustained, and plaintiffs' action for partial lease cancellation and damages is dismissed. Costs of this appeal are assessed to plaintiffs-appellees.
REVERSED.
NOTES
[*] Judge Edward M. Mouser of the Thirty-Third Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.