632 So.2d 872 (1994)
Marie Wimbish HUNT, et al., Plaintiffs-Appellants,
v.
R.A. STACY and Moses Ascher, Defendants-Appellees.
No. 25578-CA.
Court of Appeal of Louisiana, Second Circuit.
February 23, 1994.
*873 Newell & Newell by David M. Newell, Homer, for appellants.
Greene, Ayres & Mayo by Robert K. Mayo, Shreveport, for appellees, Naomi Goodman, Robert Ascher and Margaret Ascher Beach.
Pugh, Pugh & Pugh by Robert G. Pugh, Shreveport, for appellees, R.A. Stacy and Alice Stacy.
Before MARVIN, LINDSAY and STEWART, JJ.
STEWART, Judge.
Plaintiffs, Marie Wimbish Hunt, Hazel Hunt MacFedries, and Marsha Hunt Veinott, filed suit against defendants, R.A. Stacy and Moses Ascher, to cancel certain oil, gas, and mineral leases and assignments thereof. Plaintiffs sought cancellation of the leases, alleging that defendants failed to explore and develop the leased property. The trial court sustained defendants' exceptions of want of amicable demand and prematurity. Plaintiffs, the landowners, appeal.

Facts
In 1938, plaintiffs' antecedents executed four leases which covered approximately 112 acres in Claiborne Parish. In each lease, the landowner leased to Johnnie W. Adkins his or her undivided interest in oil, gas, and mineral rights to the following land: (1) the Southwest Quarter of the Southwest Quarter, Section 8, (2) the East half of the Southeast Quarter of the Southeast Quarter, Section 7, and (3) the West half of the Northwest Quarter of Section 5, all in Township 23 North, Range 8 West. A couple of months later, Adkins assigned the four leases to Skelly Oil Company. In 1943, Skelly Oil Company assigned its interests in Sections 7 and 8 to defendants' antecedents, Moses Ascher and R.A. Stacy. Skelly Oil retained its interests in Section 5. Apparently, Getty Oil Company succeeded Skelly Oil Company as Adkins' assignee.
In 1984, plaintiffs' attorney, Mr. Newell, communicated with Getty Oil and with Stacy's attorney, Mr. Shuey, via several letters, regarding these leases. Among the letters was one dated July 12, 1984 (admitted into evidence as H-5) in which Mr. Newell noted that there was no production on Sections 5 and 7, although a well was located in Section 8. This letter referred to itself as "a formal placing in default and notification of breach of the contract", and demanded "a release of the leased premises situated in Section 5, 7, and 8 or any parts thereof which tracts are not currently within a producing unit." In another letter, dated September 28, 1984 (admitted into evidence as H-7), Newell again formally placed Stacy "in default for failure to further develop the leased premises", and indicated that plaintiffs would take legal action if they did not receive a formal release of the acreage in Section 7 within ten days.
*874 In September 1984, Getty Oil Company assigned to plaintiffs its remaining leasehold interest in Section 5. By letter dated October 29, 1984 (admitted into evidence as H-9), Newell notified Shuey of the assignment from Getty Oil and stated:
Enclosed is a copy of an assignment from Getty Oil following a suit that I filed against them. They have assigned their interest in Sections 5 and 7. The intent was to protect your interest in Section 8, which was held within a unit. My clients have no plans to further pursue the matter.
In 1989, Newell sent Stacy a letter, dated October 27, 1989 (H-10), in which he referred to the July 12, 1984 request for release of various tracts and stated that,
Since no steps were taken in accordance with the lease contract, for further development, we are considering the lease contract to have terminated and to at this point no longer be in effect.
On October 30, 1989, plaintiffs filed suit against defendants seeking cancellation of the leases. Defendants filed dilatory exceptions of prematurity, want of amicable demand, and nonjoinder of necessary parties. Defendants also filed a peremptory exception of nonjoinder of indispensable parties.

Action by the Trial Court
At the hearing on the exceptions, the parties stipulated that the only issue before the trial court was that of failure or lack of amicable demand sufficient to initiate the instant lawsuit. Plaintiffs' counsel noted the existence of other issues in the suit which would be handled at a later time. Plaintiffs' counsel also introduced into evidence the 1984 Getty Oil assignment to plaintiffs of part of the original leasehold interest (Section 5) and asserted this was a document which "raises an issue of who owns the lease". Thus, the record is not clear whether the stipulation includes the issue of "who owns the lease", i.e., it is unclear whether, at the hearing, plaintiffs' counsel considered this a sub-issue of the question of sufficient amicable demand.
The trial court found, in essence, that H-9, in which Mr. Newell stated that the plaintiffs had no plans to further pursue the matter, superceded letters H-7 and H-5. The trial court found that the failure of the lessee's obligation to reasonably develop and explore the leased premises is a passive breach and, therefore, requires a placement in default prior to filing the lawsuit. In its reasons for judgment, the trial court states that H-5 cannot be an amicable demand because H-9 states that plaintiffs would not pursue the matter further. The trial court concluded that plaintiffs had made no amicable demand upon defendants and that the instant suit is therefore premature. Accordingly, the trial court sustained defendants' exceptions of want of amicable demand and prematurity, and dismissed plaintiffs' suit. Plaintiffs, the landowners, appeal.

Discussion
Appellants' first assignment of error is that the trial court erred in determining that the failure of the lessee's obligation is a "passive breach". Appellants correctly note that, in general, the Louisiana Civil Code provisions for putting in default are applicable to mineral leases under LSA-R.S. 31:135. Appellants then argue that putting the obligor in default is not a prerequisite to filing suit. Comment (d), LSA-C.C. art. 1989. The essence of appellants' argument on this assignment is that the distinction between passive and active breaches was abrogated in 1984 when the Civil Code was revised. Therefore, according to appellants, there is neither a requirement for defining whether the breach is active or passive, nor a requirement for putting in default prior to the filing of the lawsuit, except in accord with the lease contract.

Do passive breaches still exist?
When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. LSA-C.C. art. 10. Laws on the same subject matter must be interpreted in reference to each other. LSA-C.C. art. 13. In the instant context, Civil Code article 1989 is the more general, and R.S. 31:135 the more specific, of the two. LSA-R.S. 31:135 reads as follows:

*875 § 135. Rules of default applicable except as specified
The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases subject to the following modifications.

LSA-C.C. art. 1989 provides that:
Damages for delay in the performance of an obligation are owed from the time the obligor is put in default.
Other damages are owed from the time the obligor has failed to perform.
Neither LSA-R.S. 31:135 nor LSA-C.C. art. 1989 mentions passive or active breaches.
It is true that the comments to Civil Code article 1989 states that "the distinction between active and passive breach has been abandoned." Comment (f), LSA-C.C. art. 1989. Citing 2 S. Litvinoff, Louisiana Civil Law Treatise, "Obligations" § 274 at 517 (1975), the comments to this code article state that putting the obligor in default is unnecessary prior to filing a suit for compensatory damages because the judicial demand implies a demand for dissolution. See Comment (d), LSA-C.C. art. 1989. However, the comments to LSA-C.C. art. 1989 recognize that R.S. 31:135 et seq. provide special exceptions to the general rule that a putting in default is not a prerequisite to filing suit. Comment (e), LSA-C.C. art. 1989.
One of these exceptions to the general rule is the jurisprudential rule that passive breaches require a putting in default prior to judicial demand. The comment to the mineral code, LSA-R.S. 31:135, states the following (emphasis ours):
It has been asserted that default should be a prerequisite to suit only when the party complaining is seeking to recover delay damages and that it should be of evidentiary significance but should not be a prerequisite to an action seeking dissolution of a lease for nonperformance. While this theory has its attractions, it was felt that the established jurisprudence which requires a putting in default, except in certain limited cases, as a prerequisite to a suit seeking dissolution, damages, or both was too well entrenched for radical change to be feasible. It is, therefore, the intent of Article 135 generally to preserve the existing jurisprudence interpreting the Civil Code articles on default in connection with actions for nonperformance of the obligations of a mineral lease. [Citation omitted.]
The division of breaches into active and passive violations now contained in [C.C. arts. 1989, 1994] of the Civil Code will be preserved under Article 135.... That violations of mineral leases may be either passive or active is established.
It thus appears that the legislature intended to retain the distinction between passive and active breaches, as well as the jurisprudence regarding these classifications, at least as to contracts involving oil, gas and other minerals. Accordingly, we conclude that passive breaches do still exist.

Is the instant alleged breach a passive breach?
After production in paying quantities has been obtained, it is the duty of the lessee to develop and operate the property leased as a reasonably prudent operator, for the mutual benefit of himself and his lessor. LSA-R.S. 31:122. Each mineral lease therefore contains an implied covenant that the lessee has a duty to develop the leased premises. See Taussig v. Goldking Properties, Co., 495 So.2d 1008, 1014-1015 (La.App. 3d Cir.1986). In Taussig, Id., the court stated that,
Since the duty to develop is an implied obligation, the jurisprudence has consistently held that a breach of this duty is passive, and a formal placing in default is required before judicial intervention may be sought. Trinidad Petroleum v. Pioneer Natural Gas, 416 So.2d 290 (La.App. 3d Cir.), writ denied, 422 So.2d 154 (La. 1982); Pipes v. Payne, 156 La. 791, 101 So. 144 (1924).
Appellants argue that the instant obligation is not an implied obligation because the Pooling and Unitization Agreement states that it is "subject, however, to the implied obligation to develop the lands covered by said leasehold contracts, ..." Appellants assert that, because this implied obligation is specifically stated, it can no longer *876 be considered "implied;" therefore, it is an express obligation for which there is no requirement for any "placing in default."
Appellees were not parties to the Pooling and Unitization Agreement, dated May 15, 1943 and admitted into evidence as H-14. This agreement did not enlarge appellees' duties to appellants under the original set of leases executed in 1938. Thus, we find no merit in the argument that the 1943 agreement transformed an implied duty to develop into an express duty to develop.
For these reasons, we find no error in the trial court's finding that the alleged failure to develop is a passive breach and thus requires a placing in default prior to judicial demand for cancellation of the lease.

Did appellants timely put appellees in default?
Appellants' second and fourth assignments of error are that the trial court erred in finding that (1) the July 12, 1984 letter (H-5) is not a placement in default and (2) there has been no placement in default, therefore plaintiffs' suit is premature.
In each of the original four leases, paragraph 8 states that, if the lessor considers that operations are not in compliance with the contract,
lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.
The applicable language in the H-5 letter reads as follows:
The purpose of this letter is to notify you in accordance with the mineral laws of the State of Louisiana that the lessors consider you to be in breach thereof by your failure to further develop the leased premises. You will please to consider this letter as a formal placing in default and notification of breach of the contract according to the mineral laws of the State of Louisiana.
Additionally, this letter is a formal demand for a release of the leased premises situated in Section 5, 7 and 8 or any parts thereof which tracts are not currently within a producing unit.
As per paragraph 8 of the hereinabove referred to leases, you have sixty (60) days within which to answer this demand for release.
We note that H-7, dated September 28, 1984, is likewise a "default demand" letter which states:
This letter is formal placement of your client, Mr. Robert Stacy, in default for failure to further develop the leased premises. If we have not received a formal release of the acreage in Section 7 within ten (10) days from the above date, we will take the required legal action.
Damages for passive breach of an obligation of a mineral lease are due only from the time the lessee is placed in default. Comment, R.S. 31:135. The jurisprudence prior to the 1984 revision of the Civil Code is clear that a putting in default must precede a judicial demand based on a passive breach of contract. See Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583 (1940).
A demand to cancel a mineral lease is not sufficient to constitute a putting in default. Brown and Taussig, both supra. The purpose of the requirement of putting in default for non-development is (1) to provide the lessee notice that the lessor considers the lessee's actions (or inaction) as violative of the implied obligation to develop the leased premises, and (2) to afford the lessee a reasonable opportunity to perform its development obligations. See Taussig and Pipes, both supra.
Each of the instant letters, H-5 and H-7, states that it is a formal placing in default. However, the central focus is to demand a release of the leases. According to the H-5 letter, lessor-appellants gave lessee-appellees sixty days to "answer this demand for release." The language of these letters does not include a request for further development, and does not afford the lessee an opportunity to perform these development obligations. Appellees correctly note in brief that the dual nature of the letter is as follows: the language which refers to a placement in default requests that Stacy develop the leased premises, yet the demand for release indicates plaintiffs' position that Stacy *877 does not have a valid lease. Under the unique facts of this case, we find no error in the trial court's determination that neither H-5 nor H-7 is a placement in default.
We note appellants' argument that a "default demand" letter, dated January 17, 1984 and introduced into evidence as H-17, was sent to Getty Oil and was sufficient to put appellees on notice under LSA-R.S. 31:132. This letter contains the same language as in H-5, which both places Getty in default and demands a release of the leases. Like H-5 and H-7, it does not include a request for further development, and does not afford the lessee an opportunity to perform these development obligations. For the foregoing reasons, we find no error with regard to the trial court's findings or absence thereof regarding H-17. Moreover, the language in H-9, dated October 29, 1984 which states that plaintiffs have no plans to further pursue the matter, combined with plaintiffs' silence and inaction for five years, supports the trial court's finding that there was no amicable demand upon defendants-appellees prior to the judicial demand. Accordingly, the trial court was not clearly wrong in sustaining the exceptions of want of amicable demand and prematurity.
Because plaintiffs did not place defendants in default, the trial court correctly sustained the exception of want of amicable demand as well as the exception of prematurity. The record reveals that the issue before the court was that of amicable demand and prematurity. The merits were not addressed by the trial court and are not addressed herein. Having found that this suit is premature, the trial court properly dismissed the petition without addressing the issues raised therein. Therefore, plaintiffs' remaining arguments are moot.
We affirm the trial court judgment. Costs are assessed against the plaintiffs-appellants.
AFFIRMED.