CARAWAY, J.
hThe case is before us for a second time on the issue of whether plaintiffs have pled a cause of action to rescind the sale of their l/8th lease royalty to their mineral lessee. Following remand of the first appeal, plaintiffs filed a supplemental and amended petition. The trial court, however, dismissed plaintiffs’ claims again on defendants’ exception of no cause of action. For the following reasons, we reverse.

Facts and Procedural History

In this case, the owners of the l/8th royalty of mineral leases claim that the sale of their royalty to the owner of the working interest of those leases was induced by fraud. The facts of the disputed transaction were described in the first review of this case before this court in McCarthy v. Evolution Petroleum Corp., 47,907 (La.App.2d Cir.02/27/13), 111 So.3d 446, writ denied, 13-1022 (La.6/28/13), 118 So.3d 1097 (“McCarthy I”). In this court’s previous decision, the appellees’ peremptory exception of no cause of action was affirmed, but the dismissal was reversed, with remand to the trial court to afford appellants the opportunity to amend their petition to state a cause of action.
According to both the original and supplemental petitions filed by the plaintiffs, the plaintiffs’ ancestors in title granted the oil and gas leases on their lands located in Richland Parish. These leases have been operated continuously for 60 years, and the lessees at the time of the contested royalty sale were Evolution Petroleum Corporation, formerly Natural Gas [ gSystems Inc.,[1] and NGS Sub Corporation (hereinafter collectively “Evolution”). The leases provided a l/8th royalty interest to the lessors.
In 2006, Evolution agreed to sell its working interest in the leases in the Delhi Unit to Denbury Resources, LLC (“Den-bury”), for a price of $50 million and other consideration. Denbury estimated that by using “CO2 enhanced oil recovery technology for the existing zone of production in the Delhi Unit,” recovery could reach 30 to 40 million barrels.
According to the plaintiffs, Evolution made more than one unsolicited written offer to purchase their royalty rights in 2006. The solicitations were made by Evolution with full knowledge of the Den- *151 bury agreement to further develop the Delhi Unit. Plaintiffs claim that the initial offer stated the funding for the purchase was only for a limited time, and that any deal must be closed by May 2006. Evolution never gave any indication to the plaintiffs that there was a pending sale to Den-bury or that the royalty interests were in fact worth much more than the plaintiffs had been led to believe. The petition indicates that the disputed sale closed in May 2006. Yet, confusingly, the petition also references a final offer that led to the disputed royalty sale in August 2006.
In connection with these solicitations by Evolution, plaintiffs contend that they were led to believe that Evolution was making these same offers to all royalty owners in the Delhi Unit, when in fact, offers were made only to the elderly or the particularly unsophisticated royalty owners who would have a minimal understanding of oil and gas matters and the Delhi Unit. | ..¡Moreover, John McCarthy lives out of state and alleges that Evolution preyed on his geographic location and inability to remain as involved in updates on the Louisiana development activities.
In their amended petition, plaintiffs reiterate that by Evolution’s ownership and operations of the Delhi Unit, “the lessees gained information regarding the characteristics of the reservoirs beneath the leased premises.” Evolution allegedly “used that information to obtain an advantage for themselves” over the plaintiffs.
The amended petition further explains that after C02 flooding commenced in 2010, the success of the project revealed that the expected recoverable reserves would be over 60 million barrels. Plaintiffs argue that the defendants knew that the price they were offering was substantially below the true value of the plaintiffs’ royalty interests, and that Evolution had ceased to operate in good faith for the mutual benefit of the parties. Plaintiffs further allege that the defendants have obtained an “improper and substantial windfall” at the expense of the plaintiffs’ substantial loss. As a new and final claim of the supplemental and amended petition, plaintiffs assert that by using, to plaintiffs’ detriment, the reservoir developmental information Evolution gained, by its operation of the lease, Evolution breached its obligation under Mineral Code Article 122, allowing for rescission of the lease.
Following the amendment of the petition, Evolution again asserted the peremptory exception of no cause of action. The trial court granted defendant’s exception, stating that the plaintiffs had no legitimate cause of faction and that the supplement and amended petition was “merely a rearrangement of the original Petition.” Plaintiffs appeal.

Discussion

We agree generally with the trial court that little clarification of plaintiffs’ claim resulted from their supplemental petition. Nevertheless, from the following allegations of the petitions and clarified timeline of alleged events, we are still not prepared to dismiss this case peremptorily.[2] While still suffering from some vagueness, the plaintiffs’ pleadings raise a unique claim of fraud which should afford the discovery and examination of the evidence surrounding the disputed transaction.
Our research indicates that this is a novel setting, not previously addressed within the oil and gas jurisprudence of this state. The plaintiffs alleged themselves in the capacity as lessors of oil and gas leas *152 es. The defendant, Evolution Petroleum, asserted its “100% working interest” ownership of the leases in the Delhi Unit in May 2006, thus placing it in the capacity of lessee of the plaintiffs’ oil and gas leases. Therefore, the disputed transaction which occurred in 2006 was, in essence, the purchase by the lessee of all future production royalties of the lessor under a mineral lease. Production royalties are considered the “rent” for the mineral lease, with such rent and the mineral lease itself extending for an uncertain and indefinite duration. Plaintiffs’ claim is that their lessee bought all future royalties, fraudulently misrepresenting the corresponding value of the Isknown productive reserves of the lease upon which those royalties would be derived. Additionally, the allegations of the petition raise the issue of fraud by silence by a mineral lessee who, at the time of the royalty purchase, was prepared and obligated for its performance under the lease contract to develop plaintiffs’ lease for enhanced production.
The petitions state that in May 2006, Evolution (then National Gas Systems, Inc.) announced in a press release that it had “entered into a definitive agreement” with Denbury for the acquisition of the leasehold rights to the Delhi Unit. The Delhi fieldwide unit is composed of 13,636 acres from which 190 million barrels of oil had been produced since 1945. Denbury paid Evolution $50 million for the conveyance of a “100% working interest” in the Delhi Unit. Evolution retained a 4.8% royalty interest in the leases and a 25% working interest backin option, conditioned on the performance of Denbury’s enhanced recovery project. Evolution’s press release references “proven reserves” and the potential recovery from the Denbury project of “between 30 and 40 million barrels of oil, net to Denbury’s interests” and 9 to 14 million barrels net to Evolution’s interests.
The petitions stated that before the announcement of the Denbury agreement, Evolution presented an offer letter to plaintiffs for the purchase of plaintiffs’ l/8th lease royalty. The offer was unsolicited by plaintiffs, and in 2006, plaintiffs were unaware of the Denbury project before and after its announcement. Plaintiffs made the following allegation about Evolution’s offer which led to the royalty sale:
Defendants offered sixteen (16) years of previous royalties to Plaintiffs, which for Plaintiff Moss was $9,859.00 and for | (¡Plaintiffs McCarthy was $15,957.00 each, and they accepted said offers.
The plaintiffs’ allegations (though awkwardly stated) claim that the normal fair market evaluation for producing lease royalty rights would generally base the purchase price on “approximately eight (8) years of trailing royalties” as derived from the prior levels of production. According to plaintiffs, such evaluation of reserves would be appropriate for a declining productive zone which, unlike the oil-bearing zone for the Delhi Unit, had no potential for enhanced recovery. Therefore, plaintiffs alleged “that defendant built in a ‘fail-safe’ artifice and scheme by offering an amount of trailing royalties sufficient to produce an offer that no purchaser, unaware of the pending C02 enhanced oil recovery of Denbury Onshore, LLC, would match or outbid.” Neither such 8-year nor 16-year value assumption was appropriate in the context of Evolution’s planned enhanced recovery project according to the petition. Such assumptions suggest a value for future production from the prior low levels of production, when the value of plaintiffs’ royalty over the life of Den-bury’s enhanced production project would be greatly enhanced in the millions of dol *153 lars.[3]
A peremptory exception of no cause of action is intended to test the sufficiency in law of the petition. Villareal v. 6494 Homes, LLC, 48,302 (La.App.2d Cir.8/7/13), 121 So.3d 1246, 1250. The burden of proving that the plaintiff has stated no cause of action is upon the exceptor. The public policy behind the burden is to allow the party his opportunity to 17present evidence in court. Id. No evidence may be introduced to in support of or in opposition to the objection of no cause of action. Humble v. Pafford EMS, 47,903 (La.App.2d Cir.5/15/13), 116 So.3d 878, 883, writ denied, 13-1368 (La.9/20/13), 123 So.3d 177. The exception is triable on the face of the .pleadings, and the well-pleaded facts must be accepted as true for the purpose of determining the issues raised by the exception. Id. Generally, an exception of no cause of action must be overruled unless the allegations of the petition exclude every reasonable hypothesis other than the premise on which the defense is based, i.e., unless the plaintiff has no cause of action under any evidence admissible under the pleadings. Berry v. Insurance Co. of North America, 28,580 (La.App.2d Cir.10/30/96), 683 So.2d 310, 311, writ denied, 97-0091 (La.3/7/97), 689 So.2d 1374. Every reasonable interpretation must be accorded the allegations in favor of maintaining the sufficiency of the petition. Id.
This court reviews the decision of the trial court to grant the exception of no cause of action de novo. Skannal v. Bamburg, 44,820 (La.App.2d Cir.1/27/10), 33 So.3d 227, writ denied, 10-0707 (La.5/28/10), 36 So.3d 254. The exception raises a question of law and the lower court’s decision is generally based solely on the sufficiency of the petition. Crosby v. Stinson, 33,628 (La.App.2d Cir.8/23/00), 766 So.2d 615.
Fraud, as a vice of consent to a contract, is covered in Articles 1953-1958 of the Louisiana Civil Code. Article 1953 states:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
|sLa. C.C. art. 1953. The comments to Article 1953 explain that in addition to a false assertion or suppression of the truth, fraud may be the result of silence that is calculated to produce a misleading effect. “In the context of vices of consent ‘fraud’ means a stratagem or machination to take unfair advantage.” Revision Comment (c) to La. C.C. art. 1997.

New Lease Acquisitions v. Lessee’s Acquisition of Lessor’s Rights in Existing Lease

We will first address Evolution’s insistence that this case is not novel in our state’s oil and gas jurisprudence. Citing the case of Mims v. Hilliard, 125 So.2d 205 (La.App. 3d Cir.1960), and other such cases of lease acquisition, Evolution argues that it is settled law that a mineral lessee owes no duty of disclosure to his lessor in transactions between them.
In Mims, the plaintiffs were approached by defendant’s landman about the acquisition of an oil and gas lease on 50 acres of their land. At that time, unbeknownst to plaintiffs, 14 of their unleased 50 acres had just been included in a newly formed compulsory unit, apparently established for production from a nearby well. Plaintiffs *154 claimed fraud for the defendant’s failure to disclose the enhanced value of the 14 acres because of its inclusion in the unit. The court found no duty- to disclose and no fraud.
From these facts, the defendant’s nondisclosure in Mims obviously occurred before the lease contract existed. Therefore, the defendant’s nondisclosure did not occur while its status was that of a mineral lessee. The defendant did not already owe to plaintiffs the leasehold duty of the reasonably prudent operator when the alleged nondisclosure occurred in a transaction between them. This is a critical distinction in this case.
| JLesion and Mineral Code Article 17
In its written reasons for judgment the trial court concluded that this case “is still a claim of ‘lesion beyond moiety’.” Therefore, since lesion to rescind the sale of mineral rights is prohibited by the Mineral Code, La. R.S. 31:17, that principle prevents rescission of this transaction altogether. Such conclusion is error.
The trial court’s ruling misses the clear distinction between rescission for fraud as a vice of consent and rescission for lesion by the mere existence of a price deficiency in relation to the fair market value of the immovable. See La. C.C. art. 2589. The former involves a bad faith intent, motive, or scheme to induce error or suppress the truth, while the rescission mandated by lesion results from the price deficiency alone. Lesion, then, is implied error fixed in law, regardless of the purchaser’s motive or knowledge of his receipt of an excessively low bargain price. Plaintiffs allege that Evolution deliberately misled them about the value of their royalty interest by directing their attention to the past decline of oil production while omitting Evolution’s understanding of the value of the proven reserves recoverable through the impending enhanced recovery project.
In McCarthy I, this court distinguished the current facts from those recent oil and gas cases discussing lesion. Those cases, including Cascio v. Twin Cities Dev., LLC, 45,634 (La.App.2d Cir.9/22/10), 48 So.3d 341, and Thomas v. Pride Oil & Gas Properties, Inc., 633 F.Supp.2d 238 (W.D.La. 2009), involved disputes over a discrepancy between the offered bonus for new lease acquisition and the market rate for lease bonuses of | msimilarly situated property. Both cases discussed error as a vice of consent and the lesion bar for mineral rights acquisitions under Article 17 of the Mineral Code. Likewise, as explained above, the lack of an existing lessorAessee relationship distinguishes these lease acquisition cases.

Civil Code Article 1951

Next, the principles of Civil Code Article 1954 have significance for the measure of plaintiffs’ claim of fraud. Article 1954 provides:
Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations.
Plaintiffs assert that they had no expertise concerning the evaluation of the proven and undeveloped reserves of the Delhi Unit, nor were they aware of the proposed Denbury project at the time of their sale. We therefore find that on the face of pleadings plaintiffs alleged that they were not parties who could have ascertained the truth regarding the value of the enhanced recovery potential of their property without difficulty, inconvenience, or special skill. Plaintiffs were aware of the past *155 levels of production for the Delhi Unit upon which their royalties had been paid. They also had access to the records of the Office of Conservation revealing the prior production history. Nevertheless, an understanding of the existence of proven reserves and the technological knowledge of enhanced recovery operations require a special skill and expertise which plaintiffs are not expected to possess. On the other hand, Evolution, as the mineral ^lessee, by operating and producing the lease, gained such special knowledge about the property.
The second paragraph of Article 1954 is stated to be an exception to the first stated principle of that article. Since we find that plaintiffs are allegedly parties who could not easily obtain the truth of the value of their royalties based upon enhanced production technology and knowledge of proven reserves, the exception provision of Article 1954 is not squarely presented under these facts.
As Judge Stewart observed in McCarthy I, plaintiffs do not allege facts demonstrating that they had a relationship of confidence, as confidants with a trusted party (Evolution). Such relationship existed between the parties in certain recent cases before this court where plaintiffs put aside their ability to discover the truth about transactions in reasonable reliance upon a trusted party, usually a family member. Hickman v. Bates, 39,178 (La.App.2d Cir.12/15/04), 889 So.2d 1249; Sanders Family, LLC No. 1 v. Sanders, 46,476 (La.App.2d Cir.12/14/11), 82 So.3d 434, writ denied, 12-0414 (La.4/9/12), 85 So.3d 702; Skannal v. Bamburg, supra.
The existing relationship that plaintiffs assert is the lessor/lessee relationship. Plaintiffs did not put aside their ability “to ascertain the truth” of the oil reserves and the technological operations to produce that oil through enhanced recovery methods. Plaintiffs claim they do not possess such abilities. Instead, they assert that their lessee did not disclose the reservoir information which Evolution had gained in the operations of the lease for the parties’ mutual benefit and that such nondisclosure was fraud. |12While that claim of fraud by silence is addressed below, we will first address the allegations of the petition concerning fraud by misrepresentation.

Fraud by Misrepresentation

From Civil Code Article 1953, the jurisprudence has delineated the following elements for a fraud claim: (1) a misrepresentation, suppression, or omission of true information, (2) the intent to obtain some unjust advantage or to cause some damage or inconvenience to another, and (3) the error induced by the fraudulent act must relate to a circumstance substantially influencing the victim’s consent. Shelton v. Standard/700 Associates, 01-0587 (La.10/16/01), 798 So.2d 60; Skannal, supra.
The error in this case concerns the value of the object of the sale, which, of course, substantially influenced the plaintiffs’ consent to receive the allegedly low price. The seller’s understanding of value as it relates to price is central to the transaction, as the cause or reason why he obligates himself to sell. La. C.C. art 1967. Yet, generally, error as to the value of the object of the sale does not allow the seller to rescind. Zadeck v. Arkansas Louisiana Gas Co., 338 So.2d 303 (La.App. 2d Cir.1976). Additionally, given the speculative nature of mineral transactions in general, no lesion protection, as discussed above, is provided the seller.
The plaintiffs’ allegations go beyond a mere unilateral and erroneous assessment of the value of their l/8th lease royalty. Plaintiffs claim that Evolution used the past 16 years of production to misrepre *156 sent the present value of the future royalties. The alleged emphasis by Evolution on the past 11swhile withholding its special knowledge of the planned future production is claimed as a misrepresentation of the truth concerning the present fair value of the royalty rights.
A significant civilian principle for fraud found in the 1870 Civil Code reads as follows:
A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided the object is of such a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood; he shall then be supposed to have been influenced more by his own judgment than the assertion of the other.
La. C.C. art. 1847(3) of the Civil Code of 1870. That principle is from the expanded discussion of fraud in the source article of revised Article 1953 and remains persuasive civilian authority.
In Zadeck, supra, this court cited Article 1847(3) of the 1870 Civil Code in setting forth two important principles regarding error as to the value of the object of the sale. First, “[wjhere the means of ascertaining the value of property are equally available to both parties, a sale may not be set aside because information relating to its value was withheld by either party.” Zadeck, supra. Nevertheless, the court recognized that under the proviso of Article 1847(3), “[i]n extreme cases in which there existed great disparity of the bargaining position of the parties, our courts have set aside sales.” Id.
Certainly, the plaintiffs could have concluded on their own that the best measure of the value of their royalty could be gained from the past production history. This was a production history in which they received |Mroyalty payments for 16 years. That history could suggest the rate[4] of production for the future. The lump sum of money given by Evolution as the price would represent a discounted value of expected future production royalties. If this was the plaintiffs’ unilateral, subjective analysis, about which Evolution made no representation whatsoever, it cannot be said that Evolution induced plaintiffs’ error. If Evolution had its own much higher value for the oil reserves and no duty to its lessor to share its different appraisal, the unilateral error of the plaintiffs and the lesion bar of the Mineral Code might not allow for a cause of action.
Yet, in this case, Evolution is alleged to have made a false assertion regarding the value of the l/8th lease royalty, while plaintiffs with “ordinary attention” could not have detected the falsehood. The odd number allegedly selected by Evolution for the total price paid to the three plaintiffs, $41,773, was the exact total of the royalties received by plaintiffs for the past production. This emphasis on the past production accounts for no value attributable to the great production potential recognized in the Denbury deal. This allegedly gave plaintiffs an erroneous view of the value of their royalty rights vitiating their consent, to the sale.
*157 Because of the speculative nature of most mineral transactions, error in the value assessment of the mineral right by the transferor, in this case a mineral lessor, would generally not amount to legal error under Civil Code |1sArticle 1949 allowing for rescission. Yet, in discussing the lesion bar for mineral transactions placed in the Mineral Code, the authors of the Comment for Article 17 made the following observation:
A case could be made for application for the principle of lesion when the rights sold are in a fully developed property, thus permitting rather accurate determination of reserves and computations of values. However, considering the nature of transactions in developed properties and the facts that parties to them are usually experienced and lending institutions involved are highly conservative, the opportunities for the kind of overreaching which the concept of lesion was designed to prohibit are small indeed.
Official Comment, La. R.S. 31:17. The decision was made by the redactors therefore to reject rescission for lesion for developed properties along with all other sales of mineral rights. Nevertheless, the “accurate determination of reserves and computations of values” for the Delhi Unit as reviewed in Evolution’s press release for the Denbury project were allegedly omitted from Evolution’s representations to plaintiffs concerning this disputed sale.
In summary, we find from the allegations of the petition a stated cause of action for fraud by misrepresentation. La. C.C. art. 1847(3) of the Civil Code of 1870. Plaintiffs allege that Evolution misdirected their attention to the prior production which was largely irrelevant to the assessment of the present value of their l/8th lease royalty. Evolution allegedly had the exclusive means of assessing the value of the royalty interest and knew of the error by plaintiffs.

Fraud by Silence

The Civil Code’s express recognition of fraud by silence in Article 1953 has been expanded upon in the jurisprudence. In First Downtown Dev. v. Cimochowski, 613 So.2d 671, 677 (La.App. 2d Cir.1993), writ denied, 615 So.2d 340 (La.1993), this court discussed this issue, citing two leading Louisiana Supreme Court rulings:
To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information. Greene v. Gulf Coast Bank, 593 So.2d 630, 632 (La.1992); Bunge Corporation v. GATX Corporation, 557 So.2d 1376, 1383 (La.1990).
The existence of this duty is a legal question. Relevant factors include whether the obligation is being imposed on a seller, who is more likely to be required to disclose, the importance of the fact not disclosed; the relationship of the parties; and the nature of the fact not disclosed.
Bunge, supra at 1384. Certain special circumstances, such as where the parties stand in some confidential or fiduciary relation to one another, will give rise to a duty. See Greene, and Bunge Corporation, both supra.
As further expressed in the Bunge ruling:
This duty to speak does not result from an implied representation by silence, but exists because a refusal to speak constitutes unfair conduct.
Bunge, supra at 1383, citing W. Page Keeton, Fraud-Concealment and Non-Disclosure, 15 Tex.L.Rev. 1 (1936).
In this case, plaintiffs argue that the duty to speak arises out of the duty im *158 posed under Article 122 of the Mineral Code, which provides:
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor.
La. R.S. 31:122.
The law is clear that Evolution is neither a fiduciary nor a trustee. Certainly, the information of the lessee gained through geological data and |17technical developments involving the lease premises remains proprietary information. No duty for revealing that data to the lessor exists when the lessee otherwise is conducting operations as a reasonably prudent operator. Nevertheless, the good faith duty of Article 122 is more than just the general good faith duty of performance in contract. See La. C.C. art. 1983. The duty of the reasonably prudent operator entails certain demands upon the lessee for the use of its geological and technical understanding of the leased premises for the continuing exercise of its lease rights “for the mutual advantage and profit of both parties” to the lease. Official Comment, La. R.S. 31:122. As with all real right burdens on Louisiana property, this duty of the reasonably prudent operator requires ongoing developmental use of the lease. Otherwise, as expressed in the jurisprudence, “give up the contract.” Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26, 28 (1948).
One of the duties of a reasonably prudent operator recognized in the jurisprudence is the obligation to reasonably develop known mineral producing formations. “[T]he relevant cases hold that after production in paying quantities has been obtained from a mineral formation, it is the duty of the lessee to develop the producing formation in the manner of a reasonable, prudent operator taking into consideration both his own interests and those of the lessor.” Official Comment, La. R.S. 31:122. In Wadkins v. Wilson Oil Corp., 199 La. 656, 6 So.2d 720 (1942), cited under Article 122, the lease was cancelled because the lessee did not employ “the | isnew and successful methods of development used by others in this chalk rock stratum oil field.”
With this review of the obligation of reasonable development of the lease, the alleged facts raise the question of the lease status regarding that obligation at the time of Evolution’s purchase of the plaintiffs’ lease royalty. If Evolution was under the duty to begin reasonable development of the “proven reserves” of the .Delhi Unit, did that duty pertaining to the parties’ mutual benefit require fair disclosure of the Denbury project? “Louisiana law recognizes that the refusal to speak, in the face of an obligation to do so, is not merely unfair but fraudulent.” Bunge, supra at 1383.
This question is brought into sharper focus by consideration of the Mineral Code’s provisions and jurisprudence concerning the passive breach by the mineral lessee that may exist when reasonable development operations of the lease are in order. The concept of passive breach[5] remains relevant for mineral lease disputes despite revision of the Civil Code revisions on default of obligations. La. R.S. 31:135; *159 Hunt v. Stacy, 25,578 (La.App.2d Cir.2/23/94), 632 So.2d 872. In the Hunt ruling, this court found that the breach of the implied obligation of reasonable development was passive, requiring a formal placing in default by the lessor before judicial intervention may be sought. Id. at 875.
When we consider this breach concept in light of every reasonable interpretation of plaintiffs’ allegations, not only is Evolution seen as owing 119plaintiffs the duty of reasonable development in 2006; the proposed Denbury project indicates that Evolution was arguably in passive breach of that performance obligation. Delay in performance amounting to a passive breach would bear upon the market evaluation of plaintiffs’ l/8th royalty. Accordingly, we find that the implications of the Denbury project in the light most favorable to plaintiffs’ allegations raise the possibility of fraud by silence in this case. From the allegations, because Evolution may have been under the duty and obligation to commence a long-planned project for development as a reasonably prudent operator and in breach thereof, it could then be obligated to inform its lessors and not remain silent on its plans to fulfill its obligation as a reasonably prudent operator.
A final case which supports our determination of a cause of action in this case is Emerson v. Shirley, 188 La. 196, 175 So. 909 (1937). In that case, the Louisiana Supreme Court reversed the trial court’s determination of no cause of action involving an alleged fraudulent sale of a mineral royalty. The two parties had worked together for 10 years purchasing mineral royalty interests jointly on a 50/50 basis. The disputed royalty was acquired by them in 1926, three years before the parties ended the alleged joint venture. Plaintiff alleged that in 1936 his friend and former partner, Noble, had interposed Shirley to buy the plaintiffs royalty for a low price. The plaintiff alleged that Shirley and Noble knew about a large new production discovery and withheld that .information “notwithstanding there was then a business agreement and confidential relationship between [plaintiff] and Noble which made it the duty of Noble, morally, equitably, |9.nand legally to avoid taking advantage of any inside information.” Id., 175 So. at 911. The royalty purchased by Shirley for $500 was alleged to be worth $40,000 because of a new well on the verge of completion.
The court in Emerson acknowledged the trial court’s finding that no partnership existed between the parties, as such venture with immovable property required a written agreement. A partnership would impose a fiduciary duty upon Noble to his partner. La. C.C. art. 2809. Nevertheless, the court found:
But the allegations of the petition in this case show something more in that respect than merely a joint ownership in a royalty interest. The plaintiff has alleged such a confidential relation between himself and Noble, that he should be allowed to prove it by parol evidence.
Emerson, supra, 175 So. at 911.
If the nature of the relationship rises to a certain level, the Emerson ruling recognized a duty to speak to prevent fraud. The court found that such measure of the relationship cannot be made through a peremptory exception.

Conclusion

Because of Evolution’s duty under Civil Code Article 122 and its alleged commitment for further development of the plaintiffs’ lease at the time of the disputed royalty sale, the plaintiffs are not precluded from asserting a claim of fraud by silence. This is a novel and untested cause of action by a mineral lessor that has *160 never been specifically addressed and decided in our law. Moreover, Evolution was not completely silent because of the communications it had with plaintiffs, which are alleged to be |2i misleading. Accordingly, peremptory dismissal of this case for no cause of action is unwarranted, and the trial court’s ruling is reversed.[6] Costs of appeal are assessed to defendants.
REVERSED AND REMANDED.
GARRETT, J., concurs.

. National Gas Systems, Inc., changed its name to Evolution Petroleum Corporation in July 2006.

. In this court’s initial ruling, the three judges of the panel did not express a common understanding of the plaintiffs’ potential cause of action. Judge Stewart’s primary opinion was accepted with two separate concurrences.

. When considered with plaintiffs' alleged Delhi Unit decimal royalty interest of .00204812 and an assumption of $90 per barrel, the plaintiffs' royalty potential for Den-bury’s targeted reserves would be calculated at $9,216,540 (50 million barrels x $90 x .00204812).

. Plaintiffs do not clearly detail whether the production levels for the Delhi Unit were in decline over the prior 16 years. They did allege that prior to 2003 when Evolution (then Natural Gas Systems) acquired unit ownership, the unit production had declined to 18 barrels per day which under Evolution's operations increased over two years to 145 barrels per day. Decline in the production would be indicative of the value of the reserves under the existing stripper mode of production and the length of the time for future production.

. Former Civil Code Articles 1932 and 1933 discussed active and passive breaches of the contract, with Article 1933 stating:
When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter.
Former La. C.C. arts. 1932 and 1933 (1870).

. In reaching these conclusions concerning the possible causes of action for rescission of the royalty sale, we pretermit discussion of plaintiffs’ added, alternative claim for rescission of the entire lease for Evolution’s failure under Article 122. From plaintiffs’ own allegations, however, we note the absence of Den-bury, which is alleged to have acquired the lease after the time of the disputed royalty sale.